**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FRANK GABALDON,

    Defendant - Appellant.

No. 03-2233

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-02-1056-WJ)**

Ray Twohig, Ray Twohig, P.C., Albuquerque, New Mexico (Todd Hotchkiss, Frechette & Associates, P.C., Albuquerque, New Mexico, with him on the briefs), for Defendant-Appellant.

James Miles Hanisee, Assistant United States Attorney (David C. Iglesias, United States Attorney, and Fred Chris Smith, Assistant United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **EBEL** and **TYMKOVICH**, Circuit Judges, and **HEATON**, District Judge[*].

**EBEL**, Circuit Judge.

---

    [*]Honorable Joe Heaton, District Court Judge, United States District Court for the Western District of Oklahoma, sitting by designation.

Defendant Frank Gabaldon appeals his conviction under the federal kidnapping statute, 18 U.S.C. 1201(a), arguing that the verdict was not supported by sufficient evidence that he held his victim against her will, that her confinement was not merely incidental to her eventual murder, or that holding her provided a benefit to Gabaldon. He also challenges the district court's <u>Daubert</u> ruling, which excluded the testimony proffered by a defense expert who held himself out as an accident reconstructionist and who sought to testify, among other things, that Gabaldon would have been physically incapable of striking his victim as alleged by the prosecution.

We find that the evidence was sufficient to support Gabaldon's conviction and that the district court did not abuse its discretion in excluding the defense's expert witness. We therefore exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

**I.      Background**

The evidence at trial presented the following narrative of the crime for which Gabaldon was convicted:

Frank Gabaldon, a large man at 6'3" and approximately 400 lbs., was riding around the town of Gallup, New Mexico while consuming alcohol in his car on

February 24, 2001, accompanied by his wife Nicola and his friend R.C. Begay. Nicola was driving the Gabaldons' 1996 Buick LeSabre, Frank Gabaldon was in the front passenger seat, and Begay was in the back seat on the passenger's side of the vehicle. In the course of their drive they came across Deirdre Dale, a sixteen-year-old Navajo Indian girl, and asked her if she wanted to "party" with them. Dale agreed, got into the back seat of Gabaldon's car, and began to drink.

The group then drove to a liquor store and purchased more alcohol. After leaving the store, a dispute erupted in the back seat between Dale and Begay over Dale's refusal to perform a sexual act on Begay. According to Nicola's testimony at trial, after Begay complained out loud to Gabaldon that Dale had rebuffed him, Gabaldon told Begay to "hit that bitch." Begay began hitting Dale, and Gabaldon turned around in his front passenger's seat, reached into the back of the car, and joined Begay in striking Dale in the face and head. Dale shouted for her assailants to stop, to no avail, and ultimately she was knocked unconscious.

After the beating was over, Gabaldon directed his wife to pull the car over at a highway turn-off, where Gabaldon and Begay pulled the unconscious Dale out of the car, intending to leave her there at a location within a quarter mile of the road. Gabaldon and Begay decided not to leave Dale at that location, however, out of concern both that she would be discovered too quickly, and that Dale's fingers, which had scratched Gabaldon during the struggle in the car,

- 3 -

might have samples of Gabaldon's DNA. They placed Dale, unconscious but still breathing, back into the car and drove through the town of Gallup and beyond toward a deserted spot on the Navajo Indian Reservation.

Along the way, Gabaldon gave Begay a shoe lace, and instructed Begay to strangle Dale. When Dale continued to make noises indicating she was still breathing in spite of Begay's attempts to strangle her, Gabaldon instructed Begay in the proper technique. After Dale finally fell silent, Gabaldon instructed Begay to remove Dale's clothes and throw them out of the car. Begay complied. Later, again at Gabaldon's behest, Begay used a cigarette lighter purchased in Gallup on their way to the reservation to burn Dale's fingertips in the hopes that this would destroy any DNA evidence that might lead back to Gabaldon. Upon arriving at their destination on the Navajo Reservation, Begay and Nicola Gabaldon threw Dale's body into a ravine, where she was found on March 3, 2001.

Gabaldon was charged with first degree murder, kidnapping resulting in death, and witness tampering on June 25, 2002. A superceding indictment entered on February 12, 2003 added three charges of witness tampering. Seven days before Gabaldon's trial was scheduled to begin, the defense gave notice that it planned to introduce expert testimony from Dr. Alan Watts. Dr. Watts's report was submitted the next day, on June 3, 2003, and the government requested a Daubert hearing on June 6th. That hearing was held after selection of the petit

jury on June 9, 2003. The government challenged all nine conclusions contained in Dr. Watts's report as beyond his expertise and as unsupported by scientific methodology. The district court agreed, and excluded Dr. Watts's testimony in its entirety.

After a five-day trial, the jury convicted Gabaldon of second-degree murder and kidnapping resulting in death, and acquitted him of the witness-tampering charges. Gabaldon now appeals his conviction on the kidnapping count.

## II.     Sufficiency of Evidence

We review *de novo* claims that the evidence presented at trial was insufficient to support a conviction. United States v. Walker, 137 F.3d 1217, 1220 (10th Cir. 1998). Evidence is sufficient to support a conviction if the evidence and the reasonable inferences drawn therefrom, viewed in the light most favorable to the government, would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. Id. Our review is very deferential; we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged. Id.

The provision of the federal kidnapping statute under which Gabaldon was convicted reads as follows:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person ... when –
> ...
> (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
> ...
> shall be punished by imprisonment ... and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a).

Our cases have interpreted this statute to require, *inter alia*, that the victim be (1) held against his or her will (2) for some benefit to the captor. See Walker, 137 F.3d at 1220 (setting forth the requirements for conviction under § 1201(a)(1), which criminalizes willful interstate transportation of a kidnapped person); United States v. Toledo, 985 F.2d 1462, 1467 (10th Cir. 1993) ("[T]he involuntariness of the seizure and detention is the very essence of the crime of kidnapping.") (quoting Chatwin v. United States, 326 U.S. 455, 464 (1946)) (emphasis in Toledo omitted); United States v. Sarracino, 131 F.3d 943, 947 (10th Cir. 1997) (finding the statutory requirement that the kidnapping be done "for ransom or reward or otherwise" satisfied where "the kidnappers had some reason for the kidnapping, which, to them, would be of some benefit").[1]

---

[1]Our opinion in Walker also listed a requirement that the acts constituting kidnapping be done "knowingly and willfully." 137 F.3d at 1220. This requirement, however, is unique to the statutory language criminalizing interstate transportation of a kidnapped person. 18 U.S.C. § 1201(a)(1). We subsequently

(continued...)

*A.      Whether Dale was held against her will*

Gabaldon first challenges his conviction by arguing that the evidence did not show Dale was held against her will, citing her voluntary entry into Gabaldon's car.  According to Gabaldon, Dale's confinement in his vehicle once she had been beaten unconscious was not "against her will," since at that point she was no longer capable of formulating or expressing a will.

In an ordinary kidnapping case where the victim is able and willing to testify as to his or her consent at trial, testimony that "he or she was transported involuntarily is ... normally sufficient to support a jury finding that the victim was in fact transported involuntarily."  United States v. Hernandez-Orozco, 151 F.3d 866, 869 (8th Cir. 1998).  Where, by contrast, the victim's testimony is not available at trial but the evidence introduced indicates that the accused feloniously interfered with the victim's ability to form or express a desire to leave, the jury could rationally conclude that the victim was being held involuntarily.

---

[1](...continued)
held in United States v. Jackson that, while the insertion of the word "willfully" in § 1201(a)(1) "may require specific intent" on the part of the accused, that term's absence in other subsections of the statute indicated that other types of kidnapping covered by the statute remained general intent crimes.  248 F.3d 1028, 1031-32 (10th Cir. 2001).  Accord United States v. Sneezer, 983 F.2d 920, 922-23 (9th Cir. 1992) (holding that the kidnapping crime defined in § 1202(a)(2) is a general intent crime).

The evidence presented below indicated that Dale was beaten into unconsciousness while sitting in the back of Gabaldon's car. It would have been entirely reasonable on this basis alone for the jury to have concluded that Dale would have withdrawn any previous consent to stay.[2] Here, in any case, the prosecution produced additional evidence that Dale resisted her assailants and shouted for them to stop beating her before she was rendered unconscious. We conclude that the evidence at trial was sufficient to support the jury's conclusion that Dale was confined in Gabaldon's car against her will.

B.     *Whether Gabaldon held Dale for a "benefit"*

Gabaldon next claims that the evidence was insufficient for the jury to have concluded beyond a reasonable doubt that he held Dale for any benefit. Our cases interpreting the statutory requirement that the victim be held "for ransom or reward or otherwise," however, have repeatedly observed that the statute demands only that the holding of the kidnap victim fulfill some "purpose desired by the

---

[2]Cf. United States v. Applewhaite, 195 F.3d 679 (3d Cir. 1999). Applewhaite involved a sufficiency of the evidence challenge to a conviction under the Virgin Islands kidnapping statute, which, like the federal statute, requires a kidnap victim to be held against his will. The victim in that case was the target of a murder conspiracy, which began with him being clubbed into unconsciousness from behind and loaded into a van. The Third Circuit held that the jury was justified in concluding that the driver of the van did not intend to take his unconscious victim to the local hospital, and that the victim was therefore confined against his will. Id. at 691.

captor." De Herrera v. United States, 339 F.2d 587, 588 (10th Cir. 1964); Sarracino, 131 F.3d at 947. See also Walker, 137 F.3d at 1220 (finding the accused's holding of his victim in order to have the opportunity to convince her to remain in a relationship with him to be a sufficient "benefit"); Diane M. Allen, Annotation, Requirement, Under Federal Kidnapping Act (18 U.S.C. § 1201(a)), that Person be Held "for ransom or reward or otherwise", 71 A.L.R. FED. 687, 690-92 (2004) (summarizing rule that statutory language "or otherwise" can be satisfied by showing the victim was held for any purpose or benefit to the accused).

In Sarracino, the victim of a prior battery was induced to get into a car with the promise that he would be taken to the hospital, only to have his former assailant take control of the vehicle, drive the victim to a remote area, and kill him. On these facts, similar to the case now before us, we found the very lax benefit requirement was met where the victim's assailants "benefited, in terms of seclusion and a higher chance of secrecy, by moving [the victim] to the lonely mountain where they continued to beat him and then left him to die." 131 F.3d at 947. Given the evidence presented in that case, we held that a reasonable jury could infer that the defendants "wished to dispose of [the victim] in a location where a body was unlikely to be detected." Id.

The same principles are squarely applicable here. The government introduced evidence at trial that Gabaldon decided not to leave Dale where he and Begay first took her out of the car out of fear that Dale would be found too quickly. Keeping Dale in the car also gave Gabaldon the opportunity not only to kill her, thereby eliminating the possibility that she would identify him as one of her assailants in the initial beating, but also to try to eliminate evidence tying him to the battery and subsequent murder by having Begay burn Dale's fingers to destroy any of Gabaldon's DNA that might have been deposited there. We find, therefore, that there was sufficient evidence from which a reasonable jury could conclude that Gabaldon benefitted from transporting Dale in his vehicle, both because it provided greater secrecy in disposing of her, and because it gave him a chance to destroy evidence that would incriminate him.

C.   *Whether Gabaldon's confinement of Dale was merely incidental to her murder*

Gabaldon also argues that the evidence at trial failed to show that Dale's confinement was anything more than a merely incidental part of her murder. He bases his argument on the Third Circuit's decision in Government of the Virgin Islands v. Berry, where the court overturned a conviction under the Virgin Islands' territorial kidnapping statute on the grounds that the victim's confinement had been purely incidental to his robbery and therefore did not

amount to an independent confinement that could justify a kidnapping conviction. 604 F.2d 221, 228 (3d Cir. 1979).

The Berry court based its analysis on state courts' interpretation of state kidnapping statutes, under which the crime of kidnapping was not said to have occurred if the seizure or asportation of the victim was "merely incidental to the commission of other substantive crimes." Id. at 227 (quotation omitted). The concern motivating both the Berry court and the state courts on which it relied was that a too-literal application of the kidnapping statute would permit overzealous prosecutors to charge those suspected of relatively minor crimes involving some degree of restraint or asportation with the much more serious crime of kidnapping. Id. at 226-27. In order to avoid this difficulty, the Third Circuit adopted a four-factor test for distinguishing crimes for which kidnapping charges are justified from those where they are not, listing the factors as:

(1) the duration of detention or asportation;
(2) whether the detention or asportation occurred during the commission of a separate offense;
(3) whether the detention or asportation which occurred is inherent in the separate offense; and
(4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

Id. at 227.

The Berry test has not been widely adopted by other Circuits, a fact that may be a natural result of the fact that most federal kidnapping cases involve

§ 1201(a)(1), which criminalizes the interstate transportation of an abducted person.  See United States v. Jones, 808 F.2d 561, 565-66 (7th Cir. 1986) (rejecting as "wholly irrelevant" the argument that an interstate kidnapping was merely incidental to the interstate transportation of a woman for an "immoral purpose" in violation of the Mann Act, on the grounds that kidnapping and Mann Act offenses were "distinct and separately punishable"); United States v. Lowe, 145 F.3d 45, 52 (1st Cir. 1998) (same).  An abduction or seizure that involves enough distance traveled and time elapsed in order for the captor and the victim to cross state lines will generally constitute a bona fide kidnapping.  Where, as here, the statute requires only that a seizure or restraint take place within the special territorial jurisdiction of the United States, the difficulty highlighted by the Berry court is more likely to arise.

The Eleventh Circuit recognized this problem in United States v. Howard, where it confronted a case in which defendants challenged their convictions for attempting unlawfully to detain a DEA agent in violation of § 1201(a)(5), on the grounds that the attempted seizure was merely incidental to their crime of attempted robbery.  918 F.2d 1529, 1534 (11th Cir. 1990).  Adopting the Berry test, the Eleventh Circuit invalidated the attempted kidnapping convictions, finding the evidence insufficient for a reasonable jury to have concluded beyond reasonable doubt that defendants planned to detain their victim for longer than

necessary to rob him or that their limited detention of the DEA agent exceeded what would have been inherently necessary for a successful robbery.  Id. at 1536-37.  See also United States v. Etsitty, 130 F.3d 420, 428-29 (9th Cir. 1997) (Kleinfeld, J., concurring) (arguing that § 1201(a)(2) requires a seized or confined person to be held for an appreciable period, beyond what would be required for an assailant simply to attempt a sexual assault).

Our Circuit has yet to take a position either adopting or rejecting the Berry test.[3]  Although we find much in the Berry test to commend its use in a § 1201(a)(2) situation, we do not need to decide in this case whether formally to adopt the Berry test.  Here, the evidence clearly established kidnapping as a separate crime even if we were to adopt the Berry test.  Cf. United States v. Peden, 961 F.2d 517, 522-23 (5th Cir. 1992) (recognizing the problems the Berry test was meant to address, but declining to adopt or reject that test where its test

---

[3]The issue was raised in Sarracino as part of the defendant's argument that he did not abduct his victim for any "ransom or reward or otherwise."  We held that the evidence was sufficient for the jury to conclude that Sarracino derived an independent benefit from detaining and moving his victim to a deserted locale, without addressing the claim that the victim's transportation was incidental to his murder.  131 F.3d at 947.  And, in United States v. Cassidy, we rejected an overbreadth and vagueness challenge to a conviction under § 1201(a)(2) for a federal prison inmate who held two prison guards captive for ten hours in the course of a failed escape attempt.  571 F.2d 534, 537 (10th Cir. 1978).  Although the defendant had seized his guards in order to advance his escape efforts, their ten hours' detention left little room for any claim that the seizure was merely an incidental part of the crime of attempted escape.

- 13 -

requirements would have been met on the facts of the case). Gabaldon concedes that he held Dale longer than would have been minimally necessary for her to be murdered as he acknowledged in his appellate brief that they drove around with Dale while "deciding what to do with her." What is more, the jury was presented with ample evidence to support a conclusion that Gabaldon decided to continue transporting the unconscious and battered Dale in his car, not just because he wanted to kill her, but because he wanted to avoid arrest and prosecution on battery charges.

The evidence presented at trial was sufficient for a reasonable jury to have concluded beyond a reasonable doubt that Gabaldon held Dale against her will for a purpose or benefit he desired, and that her confinement was not merely an inconsequential and inherent side-effect of her murder. We therefore reject Gabaldon's sufficiency of evidence claims.

### III. __Daubert__ Issue

Gabaldon also contends that the district court erred in excluding the testimony proffered by the defense expert, Dr. Alan Watts. We disagree.

Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes on the district court a gatekeeper function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). The touchstone for relevance, in this context, is whether "the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 591 (quotation omitted). For expert testimony to be reliable under Daubert, it "must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" Dodge v. Cotter Corp.. 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting Daubert, 509 U.S. at 590) (internal quotation marks omitted). The Daubert Court provided a non-exclusive list of four factors that may guide the district court's decisionmaking:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing;
> (2) whether the opinion has been subjected to peer review;
> (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and
> (4) whether the theory has been accepted in the scientific community.

Dodge, 328 F.3d at 1222.

The district court's decision to admit or exclude expert testimony under the Daubert standard is reviewed on appeal for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138-39 (1997). The district court's discretion in this area is broad, "both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate

- 15 -

determination of reliability." Dodge, 328 F.3d at 1223. We will not overturn the trial court's ruling on admissibility "unless it is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quoting Atlantic Richfield Co. v. Farm Credit Bank of Whichita, 226 F.3d 1138, 1163-64 (10th Cir. 2000)) (internal quotation marks omitted).

Of the nine opinions set forth in the defense expert's report to the court, only numbers three and four arguably relied on some mathematical reasoning or Dr. Watts's expertise in accident reconstruction. Conclusion number three relied on a series of force and impact calculations to conclude that "even an 'average size' person" could have delivered the blows to Dale's face and head, since none of her facial bones were broken. The point of this testimony, by Watts's own admission, was to show that the blows to Dale's face need not have been delivered by the 6'3", 400 lb. Gabaldon, but could have been inflicted just as well by his accomplice Begay, who was seated next to Dale in the back of the car.

Although the district court excluded this conclusion as unhelpful to the jury because it was "not scientific and f[e]ll into the category of speculation," the larger problem is that this conclusion is utterly obvious and is not something for which expert testimony is needed. As Watts conceded on the stand, the average

juror would know that a woman of Dale's size could be hit by a man smaller than Gabaldon in such a way as not to break her facial bones. Watts's calculations might have been relevant if the conclusion reached was that Gabaldon could *not* have delivered the blows to Dale's face; his conclusion that Begay could not be ruled out is of no help to the jury, especially where Begay admitted at trial that he had in fact struck Dale. The district court did not abuse its discretion in excluding this piece of the expert's proffered testimony.

Watts's fourth conclusion stated that the internal geometry of Gabaldon's car would have made it difficult for him to reach Dale to deliver the blows that knocked her unconscious and ultimately contributed to her death. Watts claimed this statement relied on published data on the 1996 Buick LeSabre, to calculate the distance between the front seat and the far corner of the rear seat and to find that Gabaldon would have had to lean back between the two front seats to reach Dale with his blows. Watts then asserted that the act of leaning back and holding on to the front seat would have prevented Gabaldon from striking Dale with much force, but offered no scientific support for that statement.

The district court did not abuse its discretion in excluding this conclusion as lacking in "sufficient methodology and reasoning." Watts's opinion about Gabaldon's effective reach and ability to land forceful blows while holding on to the front seat back was entirely conclusory and unsupported by any scientific

evidence or reasoning.  Watts conceded that his theory could have been tested by placing Gabaldon in a 1996 LeSabre and taking measurements, but no such testing was done.

The remaining seven conclusions offered by Dr. Watts were either speculative, simply restated the contents of the autopsy reports, or dealt with subjects that required the expertise of a pathologist or a toxicologist—expertise that Watts did not have.

We find that the district court acted well within its discretion in excluding Watts's proposed "expert" testimony under Daubert.

## IV.    Conclusion

We find that the evidence presented at trial was sufficient to convict Gabaldon under the federal kidnapping statute.  We also find the district court's decision to exclude the defense expert's proffered testimony was a legitimate exercise of its discretion.  Gabaldon's kidnapping conviction is therefore AFFIRMED.