**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL ZUNI,

Defendant - Appellant.

No. 07-2023

(D. New Mexico)

(D.C. No. CR-05-2369-JB)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

On October 26, 2005, defendant and appellant Daniel Zuni was indicted by

a federal grand jury on two counts: one count of kidnapping Denise Billy, in

violation of 18 U.S.C. §§ 7(3) and 1201(a)(2), and one count of aggravated sexual

abuse, in violation of 18 U.S.C. §§ 7(3), 2241(a) and 2246(2)(A).[1] A jury found

Zuni guilty of kidnapping but not guilty of aggravated sexual abuse. He was

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[1]The government asserted federal jurisdiction over these crimes because
they were alleged to have occurred, at least in part, on federal land.

sentenced to 121 months' imprisonment, followed by five years of supervised release, which included as a special condition that Zuni submit to sex offender treatment. Zuni appeals his conviction and sentence, both of which we affirm.

**BACKGROUND**

Because Zuni challenges the sufficiency of the evidence supporting his conviction for kidnapping, we recite in some detail the facts surrounding the offense. Ms. Billy and Zuni met in 1997. She then began working as a police officer for the Navajo Nation. Zuni was, at the time, a sergeant in the Navajo Nation police department.

Zuni and Ms. Billy began dating and then began living together in 1998. They also had a daughter in 1998. Zuni left the Navajo police department in 2000 to stay home and care for their daughter, while Ms. Billy remained employed at the police department. Zuni and Ms. Billy had a second child, a son, in 2000. Zuni and Ms. Billy never married. Ms. Billy referred to Zuni as her "boyfriend" and Zuni referred to Ms. Billy as his common law wife.

The relationship between Zuni and Ms. Billy was volatile. Ms. Billy admitted that, in the summer of 2002, she entered into a relationship, which included sexual relations, with a fellow officer, Elroy Naswood. Tr. of Trial Proc. at 702. Ms. Billy's relationship with Naswood was a source of conflict between Zuni and Ms. Billy. On one occasion, Zuni became very angry with

Ms. Billy because she had gone to Mesa, Arizona, with Naswood. On the other hand, Zuni himself testified that he had an affair with another woman while his relationship with Ms. Billy was ongoing.

In 2003, Zuni and Ms. Billy moved out of the house they shared, and Ms. Billy, along with the two children, moved into her sister's house some thirty miles south of Gallup, New Mexico. Zuni moved to Pinedale, some twenty-five miles northeast of Gallup. Ms. Billy told Zuni that she did not want to be in a relationship with him anymore, and Zuni accused her of seeing other men in the police department. Ms. Billy continued to stay with Zuni, however, several nights a week. Both parties indicated an interest in reuniting for the sake of their children, and Zuni promised Ms. Billy he would work on controlling his temper. They shared custody of the two children.

In late 2003 or early 2004, Ms. Billy moved back in with Zuni, at his mother's house in Pinedale. In May 2005, Ms. Billy moved out again, apparently after a fight in which Ms. Billy claimed Zuni reinjured her knee, which had previously been injured in a work-related incident. Zuni denied ever injuring Ms. Billy's knee. When Ms. Billy went to the hospital, however, she told hospital personnel that she had hurt her knee in a fall. The fight resulting in the renewed knee injury was precipitated by Zuni's discovery of pictures of Ms. Billy dancing in a sexually suggestive way with men at a conference she had attended. After

their argument concerning the photographs, Ms. Billy apparently attempted suicide.

At the end of May 2005, Ms. Billy obtained a temporary restraining order against Zuni, prohibiting him from contacting her or the two children. Ms. Billy moved back into her sister's house.

On June 16, 2005, there was a hearing on the restraining order, during which Ms. Billy indicated her desire to end her relationship with Zuni. Zuni frequently called Ms. Billy after the hearing, and Ms. Billy allowed him to visit their children. In July 2005, Zuni called Ms. Billy and told her he was going to file a complaint against her, including allegations related to her prior suicide attempt, if she did not "make this relationship work." Id. at 453. Ms. Billy's sergeant subsequently told her that Zuni had filed a complaint against her, in which he stated he wanted her fired.

Zuni continued to call Ms. Billy and to visit their children. Zuni indicated a desire to reconcile, but Ms. Billy did not wish to. Zuni told her he was receiving counseling for anger management. In early September 2005, while Ms. Billy was staying at a motel in connection with her work, Zuni went to the motel and, according to Ms. Billy, attempted to force her to have intercourse with him. Zuni claims it was a consensual encounter. Ms. Billy asserts that she never reported this forcible sexual encounter because she was ashamed.

-4-

Shortly thereafter, there was a second hearing on the restraining order against Zuni, and the order was modified to permit Zuni to have contact with his two children. Both parties agreed the relationship was irreconcilable and they agreed upon a custody and visitation schedule. The next day, they had an argument at their daughter's soccer game. The soccer coach testified that Zuni was belligerent and shouting profanities; Zuni denied that he did so.

With that background of the indisputably tumultuous relationship between Zuni and Ms. Billy, we turn to the events of September 21, 2005, when the particular activities relevant to this appeal occurred. It began when Zuni called Ms. Billy in the early morning to report that their son, who had spent the night with Zuni and who was already at school, was upset. Zuni accordingly asked Ms. Billy to check on their son when she took their daughter to school. When Ms. Billy got to the school, she decided to withdraw both children from that school and enroll them in a school closer to where she was living. She did so without informing Zuni of the change in school.

After enrolling the children in the new school, Ms. Billy proceeded to the Gallup Indian Medical Center to arrange counseling appointments for the children. While Zuni and Ms. Billy dispute who initiated the call, they communicated with each other about the change in school and the counseling appointments. Zuni testified that he was "a little upset" by Ms. Billy's decision to withdraw the children from the school they were in without consulting him. Id.

-5-

at 952. Zuni went immediately to the Medical Center. Zuni then suggested they take a drive and discuss their children. While Ms. Billy testified that she did not want to take a drive with Zuni, she never communicated that to him. Zuni testified that the drive was mutually agreeable. Ms. Billy, who was supposed to work that day, called her supervisor to tell her that she (Ms. Billy) would not be in to work that day. The supervisor testified that Ms. Billy sounded unusual on the phone call, and when asked "if it was regarding Zuni, . . . she said yeah." Id. at 235. Ms. Billy testified that she was already afraid because Zuni was "quiet; and when he gets quiet, . . . it's like he is already angry." Id. at 483. Zuni and Ms. Billy accordingly left the Medical Center in Ms. Billy's Trailblazer SUV, with her at the wheel and Zuni in the front passenger seat.

According to Zuni, they discussed driving to El Morro National Monument, a monument on federal land southeast of Gallup. Ms. Billy claimed she did not want to go to El Morro, although she conceded she never told Zuni that. She testified that she "was just doing whatever he was telling [her] to say and do, whatever he told [her] to do." Id. at 640. Zuni testified that they had a "general conversation" about being open and honest with each other. Id. at 959.

Approximately two miles south of Gallup, Zuni began yelling at Ms. Billy. She started to pull the car over to return to Gallup, but Zuni grabbed the steering wheel and told her to keep going in the same direction. Zuni apologized and said he would stop yelling. About twelve miles south of Gallup, Zuni started yelling

again, wanting to know who was on her cell phone contact list. Ms. Billy grabbed her phone, which was on the console between the two front seats, and read him some names from her cell phone contact list, omitting others. At one point, Zuni grabbed the steering wheel and steered the car towards oncoming traffic, stating "Denise, we're going to die today." Id. at 487-88. Ms. Billy regained control of the car and steered it back into the correct lane. Ms. Billy testified that Zuni grabbed the steering wheel two more times. Zuni denied ever grabbing the steering wheel. While conceding he was "upset," Zuni did not admit to yelling at Ms. Billy.

Ms. Billy eventually pulled to the side of the road and stopped the car. Zuni attempted to grab her cell phone, seeking to find out if she was still in a relationship with Naswood. She testified that Zuni grabbed her seatbelt and pushed it up tightly against her neck, making it difficult for her to breath. He then choked her with his hands. She further stated that Zuni told her she "was going to die and that it wasn't worth living anymore." Id. at 491. Zuni testified that he did not intentionally hurt her, although she was straining against her seatbelt in an effort to keep her cell phone from Zuni. He testified that he was in a "rage." Zuni then sat back in his seat and told her to drive. Ms. Billy testified that, at that point, Zuni "was controlling the vehicle," id. at 492, even though she was driving. She "felt her life was threatened." Id. at 644. She conceded on cross-examination, however, that a photograph taken of her later that evening did

not show any abrasion on the front of her neck from where she claims the seatbelt pressed against her. She testified that when she attempted to turn around and return to Gallup, Zuni grabbed the steering wheel and told her to keep going south.

They continued driving south and arrived at the El Sabino gas station, where Ms. Billy announced she needed to get gas. Ms. Billy filled her car with gas, then went into the store to pay for it, while Zuni stayed outside with the car. Ms. Billy was apparently crying and upset when she entered the store.[2] Ms. Billy told the woman at the cash register to call the police. Ms. Billy also gave her cell phone to the clerk, and told the clerk not to give the phone to the man she was with (Zuni) even if he asked for it. Zuni then entered the store while Ms. Billy got a drink and paid for both the drink and the gas. She testified she did not ask anyone for help, other than asking the clerk to call the police, because she was afraid Zuni would hurt her or someone else if she asked for help.

Ms. Billy again got into the driver's seat and Zuni got into the passenger seat. Ms. Billy again tried to turn north and return to Gallup, but, according to Ms. Billy, Zuni again grabbed the steering wheel and directed her to continue south. Ms. Billy claimed Zuni asked her what she had done with her phone and told her that he knew that she had left the phone with the clerk and asked the

---

[2]The store clerk testified that Ms. Billy was "scared, shaken, crying at the same time" as she told the clerk to call the police. Tr. of Trial at 247.

clerk to call the police. Zuni denied making any such statement. Ms. Billy testified that she pulled the car over and pretended to look for the cell phone. She testified that Zuni directed her to turn around and return to the store, but to drive by if a police car was there. He again denied making such a statement. They returned to the gas station, where Ms. Billy went into the store, while Zuni stayed outside near the gas pumps. Ms. Billy stated that she asked the store clerk if she had called the police, to which the clerk responded that she had. Ms. Billy again asked the clerk to hold the phone until she (Ms. Billy) could return for it. The clerk testified that Ms. Billy was "still shaken, shaken up and crying a little." Id. at 250.

Ms. Billy resumed driving her car, with Zuni in the passenger seat, and she again tried to turn north towards Gallup, but Zuni grabbed the steering wheel and kept the car moving south. Ms. Billy testified that she "was going to do everything that he wanted [her] to do and whatever he wanted [her] to see, just so [she] could go home to [her] kids." Id. at 500. As they drove, Ms. Billy stated Zuni continued to say that they were both going to die and that it was not worth living. He also threatened to kill Ms. Billy's sister and to harm her co-workers. Zuni also talked about wanting to be a family again. Ms. Billy testified that she was afraid, and she apparently continued to cry. They both discussed how each of their families at times interfered with their own relationship. Zuni and Ms. Billy

passed various buildings as they drove, including a church, a post office and a fire department.

When they reached El Morro, they parked in the parking lot for the visitor's center. As they drove into El Morro, Zuni commented on the height of the cliffs, which Ms. Billy understood as a threat. They went into the visitor's center, Ms. Billy went into the restroom to clean up, and Zuni went to purchase tickets so they could walk along the trails. There were two other couples in the center, as well as two staff members. Ms. Billy testified that she did not ask anyone for help because she feared Zuni would hurt her or someone else.

Zuni took Ms. Billy's hand and they climbed up a trail. According to Zuni, they passed perhaps ten other people as they walked up the trail. At the top, they had what Zuni testified was consensual sexual intercourse and she claimed was coerced. Ms. Billy then went to sit at the edge of a cliff. She testified that she and Zuni discussed how the police and an ambulance would extricate a body that had fallen off the cliff. Ms. Billy testified that she thought Zuni was going to kill her, so she decided to do whatever he told her to do. They walked back down the trail, along which Zuni occasionally stopped and kissed her, and he laughed and joked as if nothing unusual had happened.

After walking through the visitor's center, they got back in Ms. Billy's car, but this time with Zuni sitting in the back seat, behind Ms. Billy. They began to drive back towards Gallup. As they were driving, Zuni began to squeeze

-10-

Ms. Billy's breasts. She testified that she asked him to stop, but he did not. Zuni directed Ms. Billy to drive down a dirt road, into the forest, and she did as she was told because she was afraid of him. He put the back seats in the SUV down flat and invited her into the back to "talk." When she had gotten into the back, Zuni told her to take her clothes off, and they again had what he claimed was consensual and she claimed was coerced sexual intercourse.

They then both got dressed, with Zuni in the driver's seat and Ms. Billy remaining in the back. Zuni drove to his sister's house in Gallup, went inside, changed his shirt, and came out with a soda for Ms. Billy. Zuni drove to a cellular phone store where Ms. Billy reported she had lost her cell phone. They finally returned to the Medical Center parking lot. Zuni told her that he knew he had hurt her but he wanted to forget about what had happened that day and move forward for their children's sake. He walked off to his car and Ms. Billy called her sister, who met her at the Medical Center, where Ms. Billy reported she had been raped. There were bruises and scratches on Ms. Billy's hands and neck. Id. at 519-21.

Law enforcement personnel interviewed Zuni that evening. While he gave slightly different versions of what happened at different points during the interview,[3] the officers who interviewed Zuni testified that he ultimately admitted

_____

[3]One of the officers who interviewed Zuni testified that Zuni's demeanor and his version of what happened changed after the officer misled Zuni into

(continued...)

he used the seatbelt on Ms. Billy; that he had lost his temper; that he did not remember trying to choke her but it was possible; and that Ms. Billy had told him she was afraid of him. He also acknowledged saying, "[w]e are going to die today" after they left the gas station. He claimed that all the sexual contact was consensual, including the first one, which occurred some thirty-five minutes after he choked Ms. Billy and threatened to kill her. Zuni admitted it was possible that Ms. Billy had sex with him because she was scared. He also stated that he had mentioned to Ms. Billy the height of the cliffs at El Morro, but that he had not intended it as a threat. Zuni admitted that he could not remember everything because he had lost his temper and he often forgot things when he lost his temper.[4]

At trial, Zuni essentially testified that Ms. Billy had agreed to everything that had happened on September 21. He denied ever taking control of the steering wheel, and he denied ever saying they "were both going to die today." He further testified that Ms. Billy voluntarily drove to El Morro, that they discussed their children and their relationship the entire way, and that, while he did mention the height of the cliffs, he did not intend that as a threat. Zuni again stated that all of

---

[3](...continued)
believing that his conversation with Ms. Billy in her car had been recorded.

[4]Zuni testified that he was "raging" that day in the car with Ms. Billy. He described "raging" as being "within [him]self. [He] was upset with [him]self." Tr. of Trial Proc. at 1019.

the sexual encounters were consensual. He admitted that he apologized to Ms. Billy when they returned to the Medical Center parking lot, but that his apology was in reference to the separation of their family. The government introduced into evidence a letter of apology Zuni wrote to Ms. Billy and their two children. Id. at 1022. After a four-day trial, the jury found Zuni guilty on the kidnapping charge, but innocent of the sexual abuse charge. Zuni did not move for a judgment of acquittal, based on the sufficiency of the evidence, nor did he otherwise object on that ground.

In preparation for sentencing, the United States Probation Office prepared a presentence report ("PSR"), which calculated Zuni's advisory sentencing range under the United States Sentencing Commission, Guidelines Manual ("USSG") as 292 to 365 months, based upon a total offense level of 40 and a criminal history category of I. It also recommended that, as a special condition of supervision upon release, Zuni participate in a sex offender treatment program. Zuni filed objections to the PSR, asserting that the correctly calculated advisory Guidelines offense level is 32. He also sought a variance below the advisory Guidelines range.

In particular, Zuni objected to two enhancements that had been added to his base offense level: a six-level enhancement pursuant to USSG §2A4.1(b)(5) for sexual exploitation of the victim, and a two-level enhancement pursuant to USSG §3C1.1 for obstruction of justice. At sentencing, the district court sustained

Zuni's objections to the two enhancements and determined that the total adjusted offense level was 32, resulting in an advisory Guidelines sentence of 121 to 151 months. Zuni asked the court to sentence him below the advisory Guidelines range, on the ground that his status as a police officer would require him to serve his sentence in "lockdown," thereby making his sentence more harsh, and because his crime was the result of his zeal to preserve his family, not indicative of an evil person deserving a long prison sentence.

The district court rejected Zuni's arguments for a below-Guidelines sentence, but did agree that they warranted a sentence at the low end of the advisory Guidelines range. After reviewing the factors contained in 28 U.S.C. § 3553(a), the court concluded that a 121-month sentence was appropriate. The district court also ordered that Zuni participate in a limited form of sex offender treatment as a special condition of his supervised release.

Zuni appeals, arguing: (1) there was insufficient evidence that a kidnapping occurred at El Morro National Monument; and (2) the within-Guidelines sentence, even though at the low end of the Guidelines range, and the sex offender treatment imposed as a condition of supervision, are substantively unreasonable.

## DISCUSSION

### I. Sufficiency of evidence:

"Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." United States v. Nelson, 383 F.3d 1227, 1229 (10th Cir. 2004) (further quotation omitted). "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." United States v. Summers, 414 F.3d 1287, 1293 (10th Cir. 2005). "Rather than examining the evidence in 'bits and pieces,' we evaluate the sufficiency of the evidence by 'considering the collective inferences to be drawn from the evidence as a whole.'" Nelson, 383 F.3d at 1229 (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997)). "Our review is very deferential; we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged." United States v. Gabaldon, 389 F.3d 1090, 1094 (10th Cir. 2004).

When the defendant fails to raise the issue of sufficiency of the evidence below, "we review the sufficiency of the evidence under the plain-error doctrine." United States v. Goode, 483 F.3d 676, 681 (10th Cir. 2007). "To obtain relief under this doctrine, [Zuni] must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he

satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. We have observed that, in the context of plain error review of a challenge to the sufficiency of the evidence, "it will be the extraordinarily rare case where error that is predicated upon the insufficiency of the evidence will not adversely affect a defendant's substantial rights and seriously affect the fairness, integrity, or public reputation of judicial proceedings." United States v. Schaefer, 501 F.3d 1197, 1207 (10th Cir. 2007) (citing Goode, 483 F.3d at 681 n.1).

The federal kidnapping statute under which Zuni was convicted reads as follows:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when-
>
> ...
>
> (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
>
> ...
>
> shall be punished by imprisonment . . . and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a). "Our cases have interpreted this statute to require, *inter alia*, that the victim be (1) held against his or her will (2) for some benefit to the captor." Gabaldon, 389 F.3d at 1094. The remaining requirement is that the kidnapping occur within the territorial jurisdiction of the United States.

-16-

With respect to the first requirement, "[i]n an ordinary kidnapping case where the victim is able and willing to testify as to his or her consent at trial, testimony that 'he or she was transported involuntarily is . . . normally sufficient to support a jury finding that the victim was in fact transported involuntarily.'" Id. at 1095 (quoting United States v. Hernandez-Orozco, 151 F.3d 866, 869 (8th Cir. 1998)). Regarding the second element, being held for a benefit, "[o]ur cases interpreting the statutory requirement that the victim be held 'for ransom or reward or otherwise,' . . . have repeatedly observed that the statute demands only that the holding of the kidnap victim fulfill some 'purpose desired by the captor.'" Id. (quoting De Herrera v. United States, 339 F.3d 587, 588 (10th Cir. 1964)); see also United States v. Walker, 137 F.3d 1217, 1220 (10th Cir. 1998) (finding the accused's holding of his victim in order to have the opportunity to convince her to remain in a relationship with him to be a sufficient "benefit").

Zuni argues that the requirements of the statute were not fulfilled because any "holding" of Ms. Billy occurred during the course of an assault or battery as Zuni attempted to take her cell phone from her. Other than that, he argues, Ms. Billy remained in control of her vehicle and was free to leave. He further argues that "[e]ven if any incidental 'holding' of Ms. Billy before reaching El Morro could be construed as a kidnapping, she was not held against her will within El Morro, as required for federal jurisdiction to extend over the kidnapping charge." Appellant's Op. Br. at 36.

-17-

We conclude that the elements of the statute were satisfied in this case and there was sufficient evidence establishing a kidnapping as a separate crime, regardless of the existence of any assault or battery. Both Zuni and Ms. Billy testified at trial. Ms. Billy testified repeatedly that she was afraid of Zuni, that, at least starting at the point when Zuni pressed the seatbelt to her neck and attempted to choke her, she felt she was not in control of her vehicle even though she was driving, and that she felt compelled to do whatever Zuni told her to do, because she feared he would hurt her or someone else. As the evidence above indicates, Zuni threatened her life and the life of her sister; he told her that she would die that day; he attempted to swerve the car into oncoming traffic; he choked her when she refused to hand over her cell phone; and he was, by his own admission, in a "rage." She asked the clerk at the El Sabino gas station to call the police, thereby further demonstrating her fear. The jury evidently found her testimony credible. Accordingly, her testimony that "she was transported involuntarily is . . . normally sufficient to support a jury finding that the victim was in fact transported involuntarily." Gabaldon, 389 F.3d at 1095 (further quotation omitted). There was sufficient evidence to establish that Ms. Billy was held against her will throughout most of the drive.

With respect to the element of whether Zuni held Ms. Billy for any benefit, Zuni does not seriously argue that this element was not met. We have described this "benefit requirement" as "very lax." Id. at 1096. In any event, there was

sufficient evidence that Zuni held Ms. Billy in order to discuss with her the children, and/or to convince her to return to him and/or to satisfy his sexual needs. Thus, the benefit element was satisfied.

Finally, Zuni challenges the requirement that the kidnapping occur within the territorial jurisdiction of the United States. "If the victim is no longer being held against her will, the kidnapping has ended." United States v. Toledo, 985 F.2d 1462, 1467 (10th Cir. 1993). There is evidence that Ms. Billy continued to feel unable to leave Zuni, even after they reached El Morro and had passed through the visitor's center. She testified that she interpreted his comments about the height of the cliffs, and about how a body could be removed from the bottom of the cliffs, as another threat on her life. Furthermore, the government avers that the parking lot and visitor's center are part of the National Monument, and therefore within the territorial jurisdiction of the United States. Zuni does not dispute that. Thus, even if we conclude that the kidnapping ended when Ms. Billy walked into the visitor's center, she still was held against her will within the territorial jurisdiction of the United States. That is all that is necessary to establish federal jurisdiction.

Since we have concluded that there is sufficient evidence that a kidnapping occurred, separate from any assault and/or battery that may have occurred by the side of the road when Zuni attempted to take Ms. Billy's cell phone, we may decline, as we declined in Gabaldon, to decide whether to adopt the Third

-19-

Circuit's test for whether a kidnapping was merely incidental to another crime. See Government of the Virgin Islands v. Berry, 604 F.2d 221 (3d Cir. 1979).[5] In sum, we conclude that there was sufficient evidence to support the jury's kidnapping conviction. There accordingly was no error, let alone a plain error, in permitting the verdict to stand.

## II. Reasonableness of sentence:

Zuni also argues that "[t]he ten-year sentence imposed by the district court, though within the advisory guidelines, was unreasonably harsh given the unique circumstances of Mr. Zuni's offense." Appellant's Op. Br. at 52. More specifically, Zuni argues the kidnapping was "brief and unplanned" and that he is not a typical kidnapper. He also argues the imposition of sex offender treatment as part of his supervised release was "so unrelated to his crime of conviction and so particularly burdensome given current treatment of offenders who are labeled sex offenders, that the court plainly erred in imposing that condition." Id.

We review sentences for reasonableness, guided by the factors set forth in 18 U.S.C. § 3553(a). United States v. Kristl, 437 F.3d 1050, 1053 (10th Cir.

[5]In Berry, the Third Circuit overturned a kidnapping conviction on the grounds that the victim's confinement was merely incidental to his robbery and did not constitute an independent kidnapping. The court established a four-factor test for determining when a kidnapping is a separate crime or is merely incidental to another crime. As we noted in Gabaldon, "[t]he Berry test has not been widely adopted by other Circuits . . . [and] [o]ur Circuit has yet to take a position either adopting or rejecting the Berry test." Gabaldon, 389 F.3d at 1097.

2006) (per curiam). We "review all sentences–whether inside, just outside, or significantly outside the Guidelines range–under a deferential abuse-of-discretion standard." United States v. Gall, 128 S. Ct. 586, 591 (2007); see also Rita v. United States, 127 S. Ct. 2456, 2465 (2007) (noting that "appellate 'reasonableness' review merely asks whether the trial court abused its discretion"). "[W]e accord a properly calculated Guidelines sentence a presumption of substantive reasonableness." United States v. Hernandez, 509 F.3d 1290, 1298 (10th Cir. 2007). "The defendant may rebut this presumption by demonstrating that the sentence is unreasonable in light of the other sentencing factors laid out in § 3553(a)." United States v. Arrevalo-Olvera, 495 F.3d 1211, 1213 (10th Cir. 2007) (further quotation omitted), cert. denied, 128 S. Ct. 1319 (2008).

We agree with the government that Zuni has failed to rebut the presumption of reasonableness which we accord Zuni's within-Guideline sentence. The district court carefully and thoroughly reviewed the Guidelines and the § 3553(a) factors before imposing the sentence. Zuni points to nothing specific about him or his crime justifying a lower sentence. The district court did not abuse its discretion in imposing a 121-month sentence.

With respect to the requirement that Zuni participate in sex offender treatment as a special condition of his supervised release, Zuni failed to object to this below, so we review it only for plain error. "District courts have broad

discretion to set a condition on supervised release." United States v. Hanrahan, 508 F.3d 962, 970 (10th Cir. 2007). "[W]e will remand for resentencing only when the court abuses that discretion." Id. We have further stated:

> A court may impose any condition on supervised release it deems appropriate so long as it is reasonably related to and involves no greater deprivation of liberty than is reasonably necessary given "the nature and circumstances of the offense and the history and characteristics of the defendant," the need "to afford adequate deterrence to criminal conduct," the need "to protect the public from further crimes of the defendant," and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Id. (quoting United States v. Edgin, 92 F.3d 1044, 1048 (10th Cir. 1996) (quoting 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(D))); see also 18 U.S.C. § 3583(d).

While the district court found that the government had failed to prove by a preponderance of the evidence that Zuni forced Ms. Billy to have sex with him on September 21 at El Morro National Monument, the government presented evidence at trial of other occasions when Zuni sexually assaulted Ms. Billy. The presentence report also details other incidents of domestic violence and sexual abuse, involving other women. The district court did not abuse its discretion in imposing the special condition of supervised release.

**CONCLUSION**

For the foregoing reasons, the conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge