GOVERNMENT OF THE VIRGIN ISLANDS

v.

BERRY, WARREN P.

WARREN P. BERRY, Appellant in No. 78-2046

BRIGNONI, GUILLERMO, Appellant in No. 78-2168

United States Court of Appeals

Third Circuit

Argued April 26, 1979

Filed August 7, 1979

---

615

ROGER BENNETT ADLER, ESQ. (NEWMAN & ADLER), New York, N.Y., *for appellant in No. 78-2046*

DEREK M. HODGE, ESQ. (HODGE & SHEEN), Christiansted, St. Croix, V.I., *for appellant in No. 78-2168*

JOHN LOFTUS, ESQ., Washington, D.C., *for appellee*

Before ROSENN, MARIS and HUNTER, *Circuit Judges*

### OPINION OF THE COURT

HUNTER, *Circuit Judge*

1. In these consolidated cases, Warren Berry and Guillermo Brignoni appeal from judgments of conviction for (1) kidnapping for ransom, extortion, or robbery, V.I.

Code Ann. tit. 14, § 1052 (1978), and (2) robbery in the third degree, id. § 1864. We affirm the robbery conviction and reverse the kidnapping convictions.

## I

2. The facts of this case are unique. The evidence, viewed in the light most favorable to the government, is as follows. On March 8, 1978, Luis Raul Morales, who had just quit his job, was walking home after having picked up his last paycheck. Defendant-appellant Berry, whom Morales had known since childhood, drove by and offered Morales a ride. Hearing that Morales was no longer employed, Berry offered to give him $375 credit for a pound of marijuana. Morales was to sell the marijuana and repay Berry the next day. After Morales accepted the offer, Berry drove him to Berry's house, where the marijuana was kept, gave the marijuana to him, and then dropped him off near town. Morales rolled the marijuana into joints and sold about $400 worth. However, he promptly spent the entire amount on personal items and old debts.

3. The next day, Berry and his co-defendant-appellant, Brignoni, began to look for Morales to get him to repay his debt, and eventually found him at the Black & White bar.[1] Berry asked Morales for the money which he believed Morales owed him, and Morales told him that he did not have it. According to Morales:

[Berry] told me to come with him and see if I could get the money.

I said "Well, okay."

Then, I asked him to take me over to my brother's place and I would ask him for the money and pay him, you know, and then I would pay back my brother after that.

He said "Okay."

_____

[1] Morales was actually in an apartment near the bar, but went to the bar when a barmaid informed him that appellants were looking for him.

4. On the way to Morales' brother's house, Morales saw a man known to him as "Freston"[2] coming out of a McDonald's restaurant. The driver (the testimony is unclear as to whether it was Berry or Brignoni) stopped the car next to the McDonald's and Morales got out. By this time, Freston had crossed the road on foot and was in his car. Morales, unaccompanied by either defendant, crossed the road and spoke to Freston. Morales testified that "I asked him if he had any money that he could lend me because I needed it, I owed it to [defendants]." Freston loaned Morales $35 which Morales gave to Berry when he returned to the car.

5. The trio then drove to a bar owned by Morales' brother. They parked the car next to the bar and Morales emerged from the car alone. He saw a friend, Christian, standing outside the bar, called to him and asked him for a loan. Christian had no money and Morales told him: "Okay, I will go into the bar and ask my brother for the money." Next, according to Morales:

> I went into the bar and I explained to my brother I owe these men some money, if he could loan me some money and then when I get it back I will pay him back.
>
> He said all that he had that he could have given me then was a hundred dollars.
>
> So, I took the hundred dollars and went back outside to give it to Warren Berry and told him I would pay him the rest of the money the next day, you know, or later that night, and he said "Okay."

6. Morales then got into the car and Brignoni told him that they would drop him off at the Black & White bar. However, as they drove toward the bar, they turned off in a different direction. Morales testified that he then told the defendants:

> [I]f [you] are going someplace else, drop me there and I get a ride into town.

---

[2] "Freston's" real name, and the name under which he testified at trial, is Winston Isaac.

They said that they were just going to see a friend in that area and they would give me a ride back when they come back out, so I stayed in the car with them.

7. Instead of visiting a friend, the defendants stopped the car at a beach near the Salt River. According to Morales, Brignoni and Berry "came out of the car, so I walked out of the car, too, and we walked towards the beach." Once at the beach, Berry told Morales to take all his clothes off and go for a swim. As Morales removed his clothes, Berry told Brignoni to "[g]o and get the gun." Brignoni removed a shotgun from the car trunk and gave it to Berry. The record does not reveal whether the gun was pointed at Morales. Morales walked into the water and went swimming. Berry then called for Morales to return, and he did so. Berry told him that he wanted the money by 10:00 A.M. the next day and that if Morales did not bring it to him, Morales would be killed.

8. As Berry and Brignoni walked back to the car, Berry told Morales not to come with them, and that he would find his clothes in the middle of the road when he walked home. As Morales began his walk, he met a man who loaned him a raincoat to cover himself. Subsequently, he flagged down an automobile and was driven home. Sometime later, Morales contacted the police; as he drove with two detectives to the Salt River beach, they discovered his clothes lying "in the middle of the street." His wallet, which contained $50, was missing.

9. A two count indictment was issued against both Berry and Brignoni. Count I alleged that the defendants seized, confined, carried away, and detained Morales "to extract money from him," in violation of the aggravated kidnapping statute, V.I. Code Ann. tit. 14, § 1052 (1978). Count II accused the defendants of unlawfully taking from Morales $50, his wallet, and articles of his clothing while displaying a dangerous weapon, in violation of the first de-

gree robbery statute, id. § 1862(2). After a jury trial, both defendants were convicted of kidnapping, and of the lesser included offense of robbery in the third degree, id. § 1864.[3] They were each sentenced to consecutive terms of life imprisonment on the kidnapping count[4] and ten years on the robbery count.

10. On appeal, both defendants contend that there was insufficient evidence to support the verdict as to either kidnapping or robbery; that certain evidence used to corroborate Morales' assertion that Berry had given him drugs to sell, and was attempting to collect a drug debt, was seized unconstitutionally; and that even if the evidence was seized legally, it was inadmissible under rule 404(b) of the Federal Rules of Evidence. In addition, Brignoni argues that the district court erred in denying his motion for a severance. We have reviewed these claims and find all of them meritless, with the exception of the one regarding the sufficiency of the evidence to support the kidnapping convictions.

11. Virgin Islands Code tit. 14, § 1052 (1978) provides:

§ 1052. Kidnapping for ransom, extortion or robbery

Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from any person or entity any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of kidnapping for ransom and shall be imprisoned for life.

12. On its face, section 1052 appears to apply not only to traditional kidnappings, but also to any situation in which a person, against his will, is transported, no matter

---

[3] Conviction for robbery in the third degree does not require that the defendants displayed, used, or threatened to use a dangerous weapon in the commission of the offense. See V.I. Code Ann. tit. 14, § 1864 (1978).

[4] Section 1052 of the Code, under which defendants were convicted, provides a mandatory sentence of life imprisonment. See id. § 1052.

what the distance, or restrained, no matter for how long, during the commission of a robbery, an extortion, or an attempt to exact money. Thus, our first task is to determine whether defendants at any time either transported or restrained Morales against his will.

■ 13. Until the defendants told Morales that they were going to visit a friend, but instead drove towards Salt River, the evidence could not reasonably be interpreted to suggest that they had committed a kidnapping. The principal witness for the prosecution was the "victim," Morales. Nowhere in his testimony, however, is there the slightest inference that either Brignoni or Berry had engaged in any of the acts which section 1052 prohibits. Instead, Morales' testimony is directly to the contrary. First, he does not allege that the defendants used or threatened to use any force to compel him to go with them. Second, he states that at both places where he asked the driver to stop so that he could borrow money—the McDonald's and his brother's bar—he left the car unaccompanied by either defendant. Third, when the defendants began to drive toward Salt River, Morales told them: "If [you] are going someplace else, drop me there and I get a ride into town." This request is not one that is likely to be made by a person who believes that he is being "kidnapped." Finally, Morales testified that he spoke to three people after he and the defendants left the Black & White bar: "Freston", Christian, and Morales' brother. Yet, despite the fact that the defendants were sitting inside the car when Morales spoke to each of these men, and despite the fact that Morales was out of defendants' earshot, at least while speaking to "Freston" and his brother, Morales did not tell any of them that he was being kidnapped. We find it inconceivable that a kidnap victim, blessed with the opportunity to be alone with uninvolved third parties, including his own

621

brother, would not immediately inform them of the fact of his "kidnapping."[5]

## III

■ 14. Under the literal meaning of the statutory language, however, the defendants did "inveigle," "entice," and "decoy"[6] Morales to remain with them when they told him that they were going to visit a friend, but instead drove to the beach. Moreover, while on the beach, Morales was in some sense "confine[d]." We do not believe, though, that our inquiry ends at this point. Instead, bearing in mind that the aggravated kidnapping statute carries a *mandatory* sentence of life imprisonment, we must determine whether the Virgin Islands legislature intended that every act which comes within the literal language of the statute be deemed to constitute kidnapping. If we find that this was not the legislature's intent, we must then decide whether Brignoni's and Berry's acts were of sufficient gravity to warrant being treated as kidnapping, rather than as a lesser or different crime.

---

[5] The government relies on "Freston's" statement, made in response to a question during cross examination, that when Morales approached him, he appeared "scared," and "told me that those guys were going to kill him." We do not believe that this statement, standing alone, was sufficient to enable the jury to believe beyond a reasonable doubt that defendants had committed any of the acts prohibited by section 1052. We note first that "Freston's" statement is directly inconsistent not only with Morales' recollection of his conversation with "Freston", but also with Morales' version of the entire series of events leading up to the drive to the Salt River. Moreover, even if the jury disregarded Morales' testimony and found, based on "Freston's" recollection of his conversation with Morales, that Morales *believed* that he was being kidnapped, we still could not hold that a kidnapping actually took place. It is an elemental principle under the Virgin Islands statute and all others of which we are aware that a kidnapping does not occur merely because the supposed victim thinks that he is being kidnapped. Instead, the "kidnappers" must intentionally commit acts which legitimately lead the victim to believe that he is being seized. Here, the evidence viewed in the government's favor plainly reveals that, at least until the defendants turned towards Salt River, they committed no such acts. The record is barren of any suggestion that the defendants either used or threatened to use force or trickery to compel Morales to accompany them.

[6] "Inveigle" is defined as to delude, mislead, hoodwink, or beguile. Webster's Third New International Dictionary, at 1188 (1961 ed.). "Entice" is defined as to allure, attract, or tempt. Id. at 757. "Decoy" is defined as to allure, entice, or entrap. Id. at 588.

# IV

15. We begin by invoking a settled principle of statutory interpretation—first announced more than a century ago in United States v. Kirby, 74 U.S. (7 Wall.) 482, 486–87 (1868)—which we believe is particularly applicable with regard to statutes making kidnapping a crime:

All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter.

16. The traditional rule in American jurisprudence was that any asportation—i.e., carrying away—of the victim, no matter how short in distance or duration, was sufficient to establish the crime of kidnapping. See Note, A Rationale of the Law of Kidnapping, 53 Col. L. Rev. 540, 541 (1953). This rule, which is still in force in some jurisdictions in the United States,[7] was most succinctly stated in People v. Chessman, 38 Cal. 2d 166, 192, 238 P.2d 1001, 1017 (1952), where the California Supreme Court held: "It is the fact, not the distance, of forcible removal which constitutes kidnapping in this state."[8] We are convinced, however, that the emerging body of law, and the all-but-unanimous view of the commentators, constitutes a rejection of Chessman, and an adoption of a rule consistent with the dictates of Kirby.[9]

---

[7] See, e.g., Levshakoff v. State, 565 P.2d 504 (Alaska 1977); State v. Padilla, 106 Ariz. 230, 474 P.2d 821 (1970); Johnson v. State, 262 Ind. 516, 319 N.E.2d 126 (1975). See generally 43 A.L.R.3d 399 (1972 & Supp. 1978).

[8] The Chessman rule was subsequently rejected in California. See People v. Daniels, 71 Cal. 2d 1119, 80 Cal. Rptr. 897, 459 P.2d 225 (1969).

[9] See, e.g., People v. Caudillo, 21 Cal. 3d 562, 146 Cal. Rptr. 859, 580 P.2d 274 (1978); Cuevas v. State (Miss.), 388 So. 2d 1236 (1976); State v. Johnson, 549 S.W.2d 627 (Mo. Ct. App. 1977); Wright v. State, 94 Nev. 415, 581 P.2d 442 (1978); People v. Miles, 23 N.Y.2d 527, 297 N.Y.S.2d 913, 245 N.E.2d 688 (1969). See generally Calloway v. Commonwealth, 550 S.W.2d 501 (Ky. 1977). See also State v. Fulcher, 294 N.C. 503, 243 S.E.2d 338 (1978).

17. The principal danger of overzealous enforcement of kidnapping statutes is that persons who have committed such substantive crime as robbery or assault—which inherently involve the temporary detention or seizure of the victim—will suffer the far greater penalties prescribed by the kidnapping statutes. The problem caused by overly literal interpretation of the kidnapping laws was first raised in Chatwin v. United States, 326 U.S. 455 (1946). There, the Supreme Court noted that the purpose of the Federal Kidnapping Act,[10] which contains language nearly identical to that in the Virgin Islands statute, was to combat an epidemic of "true kidnapping," id. at 464, in which "criminal bands," with "[r]ansom [as] the usual motive," selected victims "from among the wealthy with great care and study," after "fully and meticulously work[ing] out in advance" the details of the seizure. Id. at 462–63. The Court recognized the apparently long reach of the Act, but concluded that "the broadness of the statutory language does not permit us to tear the words out of their context. . . . *Were we to sanction a careless concept of the crime of kidnapping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity.*" Id. at 464 (emphasis added).

18. The inequity inherent in permitting kidnapping prosecutions of those who in reality committed lesser or different offenses, of which temporary seizure or detention played an incidental part, figured prominently in the decisions of numerous state courts to limit severely the scope of their state kidnapping statutes.[11] In People v. Daniels, 71 Cal. 2d 1119, 80 Cal. Rptr. 897, 459 P.2d 225 (1969),

---

[10] 18 U.S.C. § 408a, as amended 18 U.S.C. § 1201 (1976). That statute punishes anyone who knowingly transports or aids in transporting in interstate commerce "any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise."

[11] See note 5 supra.

624

the California Supreme Court cited with approval the Comments to § 212.1 of the Model Penal Code,[12] which provide:

[I]t is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice . . . . Examples of abusive prosecution for kidnapping are common. *Among the worst is the use of this means to secure* a death sentence or *life imprisonment for behavior that amounts in substance to robbery* or rape, *in a jurisdiction where these offenses are not subject to such penalties* . . . .

71 Cal. 2d at 1138, 80 Cal. Rptr. at 909, 459 P.2d at 237 (emphasis added).

■ 19. Similarly, in People v. Levy, 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842 (1965), the New York court noted that the word "confines" in the state kidnapping statute "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes." Id. at 164, 256 N.Y.S.2d at 796, 204 N.E.2d at 844. The court concluded, however, that "[i]t is unlikely that these restraints, sometimes accompanied by asportation, which are incidents to other crimes and have long been treated as integral parts of other crimes, were intended by the Legislature in framing its broad definition of kidnapping, even though kidnapping might sometimes be spelled out literally from the statutory words." Id. In sum, the modern approach is to construe the kidnapping statutes so as "to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal." People v. Miles, 23 N.Y.2d 527, 297 N.Y.S.2d 913, 245 N.E.2d 688 (1969).

20. If, then, not every asportation or detention rises to the level of a kidnapping, by what test do we determine

---

[12] Model Penal Code § 212.1, Comments (Tent. Draft No. 11, 1960).

whether a kidnapping has taken place? In California, it has been held that kidnapping does not occur when asportation is merely "incidental to" the commission of other substantive crimes. Daniels, 71 Cal. 2d at 1139, 80 Cal. Rptr. at 910, 459 P.2d at 238; see People v. Adams, 389 Mich. 222, 205 N.W.2d 415 (1973); Cuevas v. State, 338 So. 2d 1236 (Miss. 1976). New York cases have adopted a "merger" doctrine, which bars conviction for kidnapping when the "ultimate" crime, such as robbery or rape, "could not be committed in the form planned without the limited asportations" inherent in the crime. Miles, 23 N.Y.2d at 539, 297 N.Y.S.2d at 922, 245 N.E.2d at 694. The Model Penal Code treats the duration of the detention, and the distance of the asportation as significant, concluding that kidnapping exists only if the victim is isolated "for a substantial period," or is carried away a "substantial distance." Model Penal Code § 212.1; see People v. Caudillo, 21 Cal. 3d 562, 146 Cal. Rptr. 859, 580 P.2d 274 (1978); Wright v. State, 94 Nev. 415, 581 P.2d 442 (1978). Finally, it has been held that kidnapping indictments should be dismissed unless the asportation or detention which occurs during the course of the commission of another crime "significantly increases the dangerousness or undesirability of the defendant's behavior." See People v. Timmens, 4 Cal. 3d 411, 415, 93 Cal. Rptr. 736, 739, 482 P.2d 648, 651 (1971); Wright, 94 Nev. at 415, 581 P.2d at 443; Note, 53 Col. L. Rev. at 556; Comment, 110 U. Pa. L. Rev. 293, 296 (1961).

■ 21. We believe that despite the variance in terminology, four factors are central to each of these approaches. Those factors are: (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the aspor-

tation or detention created a significant danger to the victim independent of that posed by the separate offense. We hold that in the absence of any legislative history to the contrary, whether a defendant has engaged in kidnapping as defined by section 1052 of the Virgin Islands Code must be determined in light of these four considerations. Applying these considerations to the facts of this case, Berry and Brignoni cannot be said to have kidnapped Luis Morales.[13]

■ 22. While at the Salt River Beach, defendants robbed Morales (an offense for which they were convicted), may have assaulted him,[14] and may have attempted to commit extortion.[15] To the extent that Morales was confined *while* on the Salt River Beach, that confinement occurred during

---

[13] We also hold that the four factor test governs the construction of the lesser included offense of false imprisonment. Virgin Islands Code tit. 14, § 1051 (1978), provides:

§ 1051. False imprisonment and kidnapping

Whoever without lawful authority confines or imprisons another person within this Territory against his will, or confines or inveigles or kidnaps another person, with intent to cause him to be confined or imprisoned in this Territory against his will, or to cause him to be sent out of this Territory against his will; and whoever willfully and knowingly sells, or in any manner transfers, for any term, the services or labor of any other person who has been unlawfully seized, taken, inveigled or kidnapped from this Territory to any other state, territory or country, is guilty of kidnapping and shall be imprisoned for not less than one and not more than 20 years. This action shall not apply in any case when a parent abducts his own child.

That statute uses language virtually identical in breadth to that employed by the kidnapping statute. Thus, the risk of overzealous application of this statute by prosecutors intending to saddle the defendant with multiple penalties or penalties of substantially greater magnitude than those which attach to other substantive crimes, is equally as great as that which exists with regard to § 1052.

[14] Virgin Islands Code tit. 14, § 291, quoted in the text, requires that the accused make a "threatening gesture" at a defendant. A jury might find that Berry's instruction to Brignoni to "[g]o and get the gun," and Brignoni's compliance with that instruction constituted a threatening gesture, even if the jury found that the gun was never pointed at Morales.

[15] The Virgin Islands extortion statute, Virgin Islands Code tit. 14, § 701 (1964) defines extortion as "the obtaining of property from another person, with his consent, induced by a wrongful use of force or fear," and provides for a punishment of not more than five years. Appellants did not apparently commit an act of extortion, because there is no evidence that they succeeded in getting any money from Morales, with his consent, after their use of "force or fear" at the beach. They could, however, have been prosecuted for attempted extortion under id. § 331.

the commission of those other offenses. Moreover, the degree of confinement to which Morales was subjected was no greater than that which is inherent in the commission of those crimes. To be convicted of robbery, a defendant must take the property of another "from his person or immediate presence and against his will, *by means of force or fear.*" V.I. Code Ann. tit. 14, § 1861 (1964). Similarly, the crime of assault requires that a person make "a threatening gesture showing in itself an immediate intention coupled with an ability to commit a battery." Id. § 291.[16] Necessarily implicit in both of these violent crimes is some limited confinement or asportation. During a robbery, it is common for the victim to be confined while the robber takes his money, or to be moved a short distance so as to be secluded from public view. In like manner, it is virtually inevitable that during an assault, the victim will be confined for a brief period or moved for a short distance. We do not believe that Morales' confinement while on the beach was any different than that which is incident to the crimes of robbery and assault; as a result, under the test described earlier, that confinement will not support a conviction for kidnapping.

23. There remain only two other situations in which Morales was transported or required to move against his free will. The first took place when Morales was forced to take a swim in the ocean. The second occurred during the car ride when he was "inveigle[d]" or "decoy[ed]" into accompanying defendants to the Salt River beach. Regarding the forced swim, the defendants plainly did not commit any acts prohibited by section 1052. It is beyond dispute that with respect to a statute containing a mandatory life imprisonment term, the statutory language must be narrowly construed. Thus, the defendants did

---

[16] Battery is defined as the use of "any unlawful violence upon the person of another with intent to injure him." Id. § 292.

not "seize" Morales, because they did not clutch him, grasp him, or take him prisoner. Webster's Third New International Dictionary 2057 (1961 ed.). Nor did they "confine" him, which is to say, hold him within bounds, or keep him in narrow cramped quarters. Id. at 476. They did not "abduct" him or "carry him away,"[17] because they did not accompany him into the water. Finally, they certainly did not "inveigle" him, "entice" him, "decoy" him, or "conceal" him.[18] As to the ride to the Salt River beach, it is abundantly clear that this act of inveiglement, standing alone, is insufficient to support the conviction. First, the duration of the ride was apparently quite brief. Although the record does not disclose the length of the drive, the government concedes that it was not of "particularly long duration." Brief for Appellee at 22. This is in sharp contrast to the traditional kidnapping case, in which the victim is held for a substantial period. Second, there is no indication in the record that the brief ride created any appreciable risk of injury to Morales. In sum, while the acts of defendants were hardly admirable, we do not believe that it was the intent of the Virgin Islands legislature to deem these acts kidnapping. We therefore cannot sustain the kidnapping conviction.

CONCLUSION

24. The judgment of conviction for robbery in the third

---

[17] The phrases "abduct" and "carry away" appear to be synonymous. "Abduct" is defined as "to carry off (a person) by force" or "to lead away [a child or an underage woman] wrongfully." Webster's Third New International Dictionary, at 3. (1961 ed.).

[18] As previously noted in note 7 supra, "inveigle" is defined as to delude, mislead, hoodwink, beguile. Id. at 1188. "Entice" is defined as to allure, attract, or tempt. Id. at 757. "Decoy" is defined as to allure, entice, or entrap. Id. at 588. Each of these phrases carried the connotation of persuasion by ruse; it is evident that in directing Morales to go for a swim, appellants did not employ a ruse to get him into the water. Finally, "conceal" is defined as "to prevent disclosure or recognition of," i.e., to "hide." Id. at 469. There is nothing in the record to indicate that appellants' purpose in telling Morales to enter the water was to hide him.

degree will be affirmed. The judgments of conviction for kidnapping will be reversed.

---

ROSENN, *Circuit Judge*, Concurring

I agree with the majority that the defendants' convictions for kidnapping must be reversed, but write separately to express my views as to the reason reversal is required. I believe that it is unnecessary on this record to set up criteria by which the detention or asportation requirement of the kidnapping statute must be measured, because the critical element in this case is whether the defendants intended to commit any offense specified in the kidnapping statute. I am convinced that no such intent existed and I, therefore, would reverse the conviction for kidnapping.

The key facts of this bizarre melodrama commence after the victim Morales, unsuccessfully sought monetary aid from his friends to pay off his debt to Berry. Until this time, Morales voluntarily accompanied the defendants in their automobile as they attempted to help him locate sufficient funds to pay off the debt. Morales' testimony best describes what happened next:

Well, after I give him the money [from his brother], this other man [Brignoni] said they were going back into town and they will take me back to where they pick me up from, so I said okay and I got into the car and went with them. But, when we were going back towards town, I saw that they turn left to like, the road going around Barren's Castle. When they were going into the road I told them that if they are going someplace else, drop me there and I get a ride into town.

They said that they were just going to see a friend in that area and they would give me a ride back when they come back out, so I stayed in the car with them.

The defendants, instead of visiting their purported friend,

drove Morales to a beach. At the beach, Morales was ordered to strip, and after a gun was procured, to swim out into the ocean. After swimming for awhile, Morales was summoned back to the beach and informed by the defendants that he had until 10:00 A.M. the next day to repay the debt or else he would be killed. The defendants then took Morales' clothes and told him that he could find them in the middle of the road back to town. Morales eventually did recover his clothes but his wallet containing $50.00 was missing.

The defendants were indicted for kidnapping and robbery in the first degree. The kidnapping charge alleged that the defendants intentionally and unlawfully seized, confined and carried away Morales and detained him to extract [sic][1] money. The testimony plainly reveals that Morales entered Berry's car uncoerced. The statute, however, also makes it an offense to entice or decoy any individual for ransom or to exact money. Although the defendants may have brought themselves within the statutory catalogue covering "[a]ny person who . . . inveigles, entices, decoys" when they deceived Morales into accompanying them from the main highway to the Salt River beach, the indictment did not mention such trickery. It recited only that Berry and Brignoni had "seize[d], confine[d] and carr[ied] away." Because this difference seems to be substantial, Morales' testimony, at this point, still could not prove this element of the offense charged in the indictment. See Stirone v. United States, 361 U.S. 212 (1960).

When the three men arrived at the beach, however, Berry and Brignoni did indeed seize and confine Morales. As Morales, at Berry's direction, was removing his clothes,

---

[1] The statute uses the term "exact" money. See 14 V.I.C. § 1052. The variance between the indictment and the statute is harmless in view of the similarity in meaning between the words. Furthermore, the defendants do not complain.

Berry told Brignoni " 'Go and get the gun.' " Brignoni did so. Berry then ordered Morales to go out into the water and to swim. At least from the time that Morales started to undress—an act that implies a perceived threat —Morales was, the jury could have found, seized and confined. Courts have recognized that the essence of kidnapping is the element of compulsion and that the requisite force may occur where the victim feels compelled to obey orders because he fears harm or injury from the defendant. See People v. Dagampat, 167 Cal. App. 2d 492, —, 334 P.2d 581, 583 (1959). Accord: State v. Belkin, 549 P.2d 608 (Ariz. App. 1976); People v. Caldwell, 510 P.2d 317 (Colo. 1973). Whether the defendants "carried away" Morales at the beach, so as to satisfy the asportation requirement of the statute is more debatable. However, viewing the evidence in the light most favorable to the Government, United States v. Glasser, 315 U.S. 60 (1942), I cannot say that the jury could not have found that when the defendants forced Morales to swim against his will, that this was insufficient to establish that Morales was "carried away" by the defendants.

The majority relieves the defendants from the punitive consequences of the mandatory life sentence under the kidnapping statute by avoiding the literal meaning of the statute and importing a gloss on the asportation or detention requirement adopted by jurisdictions that have attempted to limit the broad scope of their kidnapping statutes. Although this effort commends itself under the unique facts of this case, I am concerned because it may introduce instability and uncertainty in an important area of criminal jurisprudence.

I believe, however, that the kidnapping convictions must founder because of a lack of intent on the part of the defendants to commit an offense proscribed by the kidnapping statute. The offense charged in the indictment is

that the defendants seized, confined and carried away Morales in order to extract [sic] money from him. They therefore had to possess the specific intent to exact money from Morales at the time they arguably seized and confined him on the beach:

Where the prohibited act must be done with a particular purpose or design, such as to obtain ransom, it is necessary to show that the defendant did have the specific intent to detain the victim for that purpose when he committed the act of detaining.

Wharton's Criminal Law and Procedure, § 372 at 738 (1957).

The record reveals that the defendant drove Morales around in an effort to have him obtain money to pay off his debt to Berry. When Morales had exhausted his efforts in raising sufficient funds, the defendants agreed to take him back to town. When they took the diversionary journey to the beach near Salt River, they knew Morales had no money. At this point, after witnessing Morales' futile effort to raise $375.00 from friends, it is reasonable to infer that the defendants gave up any expectation of receiving full payment of the debt that night. It is evident that by ordering Morales to strip and swim into the sea, the defendants were not intending to hold or confine Morales to exact money, but rather to impress upon him the serious need to pay the balance of his debt. If a crime occurred at this point, it may have been an assault or a false imprisonment,[2] but it was not kidnapping or robbery.

---

[2] A conviction for false imprisonment under 14 V.I.C. § 1051 (1978) might well have been more appropriate. The essence of false imprisonment is an unlawful restraint on another's freedom. Forgione v. United States, 100 F.Supp. 239, 242 (E.D. Pa. 1951), aff'd, 202 F.2d 249 (3d Cir.), cert. denied, 345 U.S. 966 (1955); Wharton's Criminal Law and Procedure, § 385 at 750. In State v. Roberts, 286 N.C. 265, —, 210 S.E.2d 396, 404 (1974), the Supreme Court of North Carolina held that kidnapping is false imprisonment plus asportation beyond the immediate vicinity of the confinement. In the instant case, an unlawful restraint was placed on Morales' freedom by the defendants' act of forcing him to swim out into the ocean. However, if any asportation occurred, it was not outside the immediate vicinity of the confinement. This would appear to be classic false imprisonment, and although the false imprisonment statute and the kidnapping

There is no evidence to support the conclusion that from the moment the defendants made their diversionary journey to the beach, to the time Morales completed his swim, the defendants were *then* attempting to rob or exact money from him. Indeed, upon completing his unexpected ocean dip, Morales was informed that he had until 10:00 A.M. the next morning to come up with the money. Such a statement from the defendants is inconsistent with any inference that they expected to exact money from Morales at the beach.

At this point, the defendants did take Morales' clothing, and it is undisputed that his wallet was later found missing. The defendants told Morales he would find his clothes on the road into town, and they evidently took them to further humiliate Morales, not for their monetary value. The missing wallet appears on this record to have been an afterthought of the defendants and unconnected with the main thrust of the events at the beach. In fact, the record does not reveal that either of the defendants knew about the presence of the $50.00 until Berry took the clothes.

I, therefore, conclude that the activities of the defendants in decoying Morales to the beach and their behavior there did not constitute kidnapping under the statute. I agree with the majority, although not for the same reasons, that the kidnapping convictions cannot be sustained. Giving the Government the benefit of all inferences as we must on this appeal, Glasser, supra, I also agree that the judgment of conviction for robbery in the third degree should be affirmed.

---

statute in the Virgin Islands employ similar language, the distinction between the two crimes recognized in Roberts could arguably be adopted. If so, a conviction for false imprisonment as a lesser included offense of kidnapping could have occurred in this case. See cases collected at Annot., 68 A.L.R.3d 828 (1976).