**WILBERT SMITH, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

D.C. Criminal App. No. 2004-90

District Court of the Virgin Islands

Division of St. Thomas and St. John, Appellate Division

July 23, 2008

411

413

DEBRA SMITH-WATLINGTON, ESQ., St. Thomas, USVI, *For the Appellant.*

MATTHEW PHELAN, AAG, St. Thomas, USVI, *For the Appellee.*

GÓMEZ, *Chief Judge of the District Court of the Virgin Islands*; FINCH, *Judge of the District Court of the Virgin Islands*; *and* BRADY, *Judge of the Superior Court of the Virgin Islands, Division of St. Croix, sitting by designation.*

## MEMORANDUM OPINION

(July 23, 2008)

After a jury trial in the Superior Court of the Virgin Islands[1] ("the Superior Court") on January 12-13, 2004, Wilbert Smith ("Smith") was convicted for robbery in the first degree, assault in the third degree, three counts of possession of a firearm during the commission of a crime of violence, and possession of ammunition. Smith timely filed this appeal from his conviction arguing:

1. The evidence produced was insufficient to sustain his conviction for robbery in the first degree, unauthorized possession of a firearm during the commission of a crime of violence, assault in the first degree, assault in the third degree, or possession of ammunition;

2. The Prosecutor engaged in reversible misconduct and violated his due process rights in eliciting testimony from a police officer regarding his post-arrest, post-*Miranda* silence;

3. The trial court erred in permitting the government to bolster the complaining witness's allegations through the use of inadmissible hearsay recitations of the witness's allegations; and

4. The trial Court erred in failing to instruct the jury on the affirmative defense available to the appellant under title 23, section 470 of the Virgin Islands Code; or, in the alternative, defense counsel was ineffective for failing to request such an instruction.

---

[1] At all times relevant to this appeal, the trial court was known as the Territorial Court of the Virgin Islands and its judges were referred to as Territorial Court Judges. Effective January 1, 2005, however, the name of the Territorial Court changed to Superior Court of the Virgin Islands. *See* Act of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004). Recognizing this renaming, this Court employs the terms Superior Court and Superior Court Judge.

## I. FACTUAL BACKGROUND AND OVERVIEW

On July 22, 2003, Wilbert Smith, a member of the Virgin Islands Weapons of Mass Destruction Task Force ("Task Force"), drove Irvin Mason ("Mason"), a fellow Task Force member, to the airport. Upon their arrival at the airport, Smith agreed to safeguard Mason's firearm, a Glock nine millimeter, until Mason returned from his trip. Mason then placed the gun and magazine under the front passenger seat of Smith's black Ford Escape. Smith, who was not licensed to carry a firearm, left the gun in the vehicle and returned to work.

Early the next morning, July 23, 2003, Smith was driving near the Nadir Gas Station, where Belony Hyppolite ("Hyppolite") had been waiting for a ride to Redhook. At this point, either Smith approached Hyppolite or Hyppolite approached Smith. As the men exchanged words, Smith remained in the driver's seat of his vehicle with the windows down and Hyppolite was standing outside the vehicle wearing a backpack. During this exchange, Smith reached toward the underside of the front passenger seat, where Mason had placed his gun the day before. The gun was then removed from under the front passenger seat by either Smith or Hyppolite. Thereafter, Hyppolite fled on foot away from Smith's vehicle. Smith began to drive after Hyppolite in his vehicle.

Hyppolite was wearing his backpack when he began running, but he threw it onto the ground during the chase. While in pursuit of Hyppolite, Smith came upon the backpack in the road. Smith stopped his vehicle, retrieved the backpack, and placed it in his vehicle. Smith then got back into his vehicle and continued to chase Hyppolite. Hyppolite, however, had run to a nearby establishment that he called "Charles Place," where he allegedly hid under some stairs. During this time, Smith arrived in the general vicinity where Hyppolite was allegedly hiding. Smith got out of his vehicle to look for Hyppolite at an establishment called "Sanchez Town Bar," but could not find him.

Meanwhile, Officers Adora John and Alphonso Boyce were patrolling the Nadir Gas Station area when a man ran toward their vehicle waving his arms. Both officers testified at trial that the man who had waved them down was Jose Morales ("Morales"). Officer John testified that Morales said he had seen a man with a gun chasing another man into Sanchez Town Bar. Officer Boyce testified that Morales said that a man with a gun had asked Morales if he had seen another man run into the bar. Morales

responded that he had. The officers then called for assistance before proceeding to Sanchez Town Bar.

Smith was walking out of Sanchez Town Bar as the police arrived on the scene. The officers observed some rounds of ammunition and Hyppolite's backpack in the car. They also found the gun pressed beneath a bench at Sanchez Town Bar. The officers thereafter arrested Smith.

The trial began on January 12, 2004. Both Smith and Hyppolite testified on their own behalf at trial. According to Hyppolite, Smith had approached his vehicle outside Nadir Gas Station and asked him if he needed a taxi. Hyppolite allegedly responded that he had no money for a taxi, but Smith persisted with comments such as "Haitians work everyday. Haitians always have some money." (Trial Tr. 81, January 12, 2004.) Smith allegedly commented on Hyppolite's bag and told him to "hold on" before he grabbed the gun from under the seat and pulled it on Hyppolite (*Id.* at 82.) Smith, however, testified that it was Hyppolite who approached him and asked him for a ride. Smith allegedly refused to give Hyppolite a ride. Hyppolite then purportedly reached into Smith's vehicle and, after a brief struggle, grabbed the gun and ran away.

During direct examination, the prosecutor asked Hyppolite whether he had given a statement to an investigator about the events that occurred on July 23, 2003. Hyppolite responded in the affirmative. The prosecutor thereafter asked whether Hyppolite had given the same statement as he did in court and Hyppolite said yes. Defense counsel objected to the prosecutor's second question on the ground that it was a leading question. The Court overruled his objection.

Also during direct examination, the prosecutor asked the arresting officer, "Now, Officer Boyce, while you were out there on the scene did you advise Mr. Smith of his *Miranda* warnings?"

A: Yes. On the scene he was advised of his rights.

Q: Did he tell you anything?

A: He didn't speak. He didn't say anything at all.

A: Thank you, Your Honor. We pass the witness.

(*Id.* at 169.) Defense counsel did not object to this line of questioning.

The trial continued for two days, after which the jury found Smith guilty of all seven counts in the information.

## II. DISCUSSION

This Court has jurisdiction to review final judgments and orders of the Superior Court. *See* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004) which repealed 4 V.I.C. §§ 33-40, and reinstating appellate jurisdiction in this Court);[2] Revised Organic Act of 1954 § 23A; 48 U.S.C. § 1613a. The trial court's conclusions of law are subject to plenary review. *Saludes v. Ramos*, 744 F.2d 992 (3d Cir. 1984). Findings of fact are reviewed for whether they are clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985). If no contemporaneous objections were made to an issue raised on appeal, then the challenged issue is reviewed for plain error. *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); FED. R. CRIM. P. 52(b).

## III. ANALYSIS

### A. Sufficiency of the Evidence

Smith argues that the government failed to produce sufficient evidence at trial to sustain his first degree robbery, first degree assault, or third degree assault charges, possession of an unlicensed firearm during a crime of violence, or possession of ammunition.

In determining the sufficiency of the evidence for a conviction, courts look at the evidence in the light most favorable to the Government. The jury verdict is sustained "if any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolf*, 245 F.3d 257, 261 (3d Cir. 2001) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). An appellant that attempts to challenge the sufficiency of the evidence bears a heavy burden. *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990) (citing *United States v. Losada*, 674 F.2d 167, 173 (2d Cir. 1982)). "We must . . . presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992). Finally, "we examine the totality of the evidence, both direct and circumstantial." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003).

---

[2] Our jurisdiction in this regard was previously provided under 4 V.I.C. § 33.

## 1. First Degree Robbery

Smith was convicted of robbery in the first degree in violation of sections 1861 and 1862 of title 14 of the Virgin Islands Code ("Sections 1861 & 1862," respectively). Robbery is defined as "the unlawful taking of personal property in the possession of another, from his person or immediate presence and against his will, by means of force or fear," with the specific intent to deprive permanently a rightful owner of his property. V.I. CODE ANN. tit. 14, § 1861 (1921); *Government of Virgin Islands v. Carmona*, 7 V.I. 441, 422 F.2d 95, 98 (3d Cir. 1970). Robbery in the first degree occurs when, in the course of the commission of the crime or of immediate flight therefrom, the defendant "[d]isplays, uses or threatens the use of a dangerous weapon." 14 V.I.C. § 1862(2) (2000).

Smith argues that the evidence adduced at trial is insufficient to prove that he was in close proximity to Hyppolite when Hyppolite dropped the backpack in the street. Accordingly, he contends, the government cannot satisfy immediate presence requirement of Section 1861.

While the phrase "immediate presence" is not expressly defined by Virgin Islands law,[3] it has clearly been interpreted to encompass circumstances in which the defendant and the victim are not within close proximity to one another at the time the property is taken. *See, e.g., Gov't of the Virgin Islands v. Berry*, 16 V.I. 614, 604 F.2d 221, 228 (3d Cir. 1979) (affirming a robbery conviction where the defendants took property from the victim's car after commanding him to swim in the ocean); *Simon v. Gov't of the Virgin Islands*, 47 V.I. 3, 29 (V.I. Super. 2002) (noting that the defendant's reading of the phrase "immediate presence" as requiring that the defendant and victim be in close physical proximity

---

[3] Several jurisdictions, however, have adopted constructive definitions of "immediate presence" that do not include physical proximity as a requirement. For example, many states have employed a "but for" test of "presence" or "immediate presence," under which an object was in a victim's "presence" if, but for the use of force or threat of force, the victim could have retained possession over it. *See People v. Bartowsheski*, 661 P.2d 235 (Colo. 1983); *State v. Glymph*, 222 Kan. 73, 563 P.2d 422 (1977); *Fields v. State*, 364 P.2d 723 (Okla. Crim. App. 1961); *Commonwealth v. Homer*, 235 Mass. 526, 127 N.E. 517 (Mass. 1920). Similarly, "immediate presence" has been defined as "an area over which the victim, at the time the force or fear was employed, could be said to exercise some physical control." *See People v. Hayes*, 52 Cal. 3d 577, 276 Cal. Rptr. 874, 802 P.2d 376 (1990). Under these tests, an object could be in a victim's immediate presence although it was in another room, or parked outside his home.

is "at odds with contemporary legal thinking" and "without merit.") These cases make clear that Section 1861 must be read liberally to allow for situations where the victim has for some reason been physically separated from the robber.[4] *Cf. Gov't of the Virgin Islands v. Jarvis*, 653 F.2d 762, 765 (3d Cir. 1981) (reversing a conviction for robbery of money where the defendants stole the victim's car, drove two and a half miles away, and then removed the money from the car a half hour later).

■ A narrow construction of the term "immediate presence" that favors the defendant seems especially unfair where the physical separation occurs because the victim has fled in fear from the defendant. For example, in *Simon v. Government of the Virgin Islands*, the defendant claimed there was insufficient evidence to sustain his first degree robbery conviction where the he took a bag of money from the victim's porch after the victim had fled in fear with the other bag. *Simon*, 47 V.I. at 30. In affirming the robbery conviction, the Superior Court stated:

> To suggest that the remaining bag of money was not taken from Connor's presence-immediate or otherwise-because Connor fled the scene in fear for his life, strains common sense. It is beyond dispute that Connor was relieved of his property due to the violent actions of Simon and Roach. Certainly, a reasonable reading of "person or immediate presence" can encompass circumstances such as these.

*Id.* at 30 (internal citations omitted).

---

[4] Other jurisdictions have also refused to require close proximity under statutes that use the term "immediate presence." *See, e.g., Webster v. Woodford*, 369 F.3d 1062, 1072 (9th Cir. 2004) (affirming the district court's robbery conviction where the victim was a quarter mile away when his property was taken); *People v. Armstrong*, 183 Ill. 2d 130, 148, 700 N.E.2d 960 (1998) (stating that "the property taken does not have to be within the victim's immediate control as long as there is some concurrence between defendant's threat of force and the taking of the victim's property."); *Jones v. State*, 652 So. 2d 346, 350 (Fla. 1995) (determining that, where the victim was attacked in bathroom, she did not surrender control of her purse that remained in her office); *People v. Harris*, 9 Cal. 4th 407, 37 Cal. Rptr. 2d 200, 886 P.2d 1193, 1202 (1994) (concluding that, where the victim was bound and blindfolded in the trunk of a car in a parking lot of an office complex that was around the corner from his home, the taking of property from victim's home and office was within the victim's presence) *Morgan v. State*, 195 Ga. App. 732, 734, 394 S.E.2d 639 (Ga. App. 1990) (reasoning that "since the victim fled the scene after he was threatened with a knife and the property was stolen before he could even drive away, that was sufficient to constitute a theft from his immediate presence.")

Here, it is undisputed that Hyppolite was wearing the backpack on his person during his encounter with Smith and at the time he began to flee from Smith's vehicle. It is also clear that Hyppolite dropped the backpack approximately one street away from Smith, and approximately three minutes after he fled from Smith's presence. Moreover, Hyppolite testified that he was standing near Smith's vehicle when Smith commented on his backpack and made statements such as, "Haitians always have money." (Trial Tr. 83, January 12, 2004.) Hyppolite stated that Smith thereafter pulled a Glock nine millimeter on him, at which point he was standing approximately twenty feet away from the vehicle. Hyppolite Said that he immediately began running when Smith pulled out the gun because he feared for his life. Hyppolite also explained that he dropped his backpack in the road because it prevented him from running quickly away from Smith.

██ Based on the undisputed facts and the eyewitness testimony most favorable to the government, a rational jury could have determined beyond a reasonable doubt that Smith unlawfully took Hyppolite's backpack after Hyppolite fled in fear for his life upon seeing Smith display a dangerous weapon. Given the liberal interpretation of "immediate presence" in the Virgin islands, there is sufficient evidence to sustain a first degree robbery conviction.

### 2. Assault

The jury also found Smith guilty of assault in the first and third degrees. *See* 14 V.I.C. §§ 295(3), 297(2). A first degree assault occurs where a perpetrator assaults another with intent to commit robbery. 14 V.I.C. § 295(3) (1957). A third degree assault occurs where a perpetrator "assaults another with a deadly weapon." 14 V.I.C. § 297(2) (1988). Generally, an assault occurs where a perpetrator "makes a threatening gesture showing in itself an immediate intention coupled with an ability to commit a battery." 14 V.I.C. § 291(2) (1921). Assault and battery are defined as "unlawful violence upon the person of another with intent to injure him, whatever be the means or the degree of violence used . . . ." 14 V.I.C. § 292 (1921).

██ The statutory requirement that the perpetrator make a threatening gesture has been interpreted liberally. *See, e.g., Berry,* 604 F.2d at 228 (noting that "[a] jury might find that [the defendant's] instruction to [his accomplice] to '(g)o and get the gun,' and [the accomplice's] Compliance

with that instruction constituted a threatening gesture, even if the jury found that the gun was never pointed at [the victim].")

■ Smith argues that the evidence cannot sustain his convictions for first or third degree assault because there Was no testimony indicating that he ever pointed the gun at Hyppolite or made any threatening gestures. Smith also asserts that he was never in contact with Hyppolite after Hyppolite fled upon seeing the gun in Smith's hand. However, Hyppolite testified that he was approximately twenty feet away from Smith when Smith pulled gun on him, and he was even closer when Smith commented about his money and his backpack. Based upon this evidence, a reasonable jury could have found that Smith made a threatening gesture with the gun showing an immediate intention and ability to injure and rob Hyppolite.

### 3. Possession of a Firearm During a Crime of Violence

■ In association with convictions for first degree robbery, first degree assault, and third degree assault, Smith was also convicted of possession of a firearm during the commission of a crime of violence. *See* 14 V.I.C. § 2253(a) (2001) ("Section 2253"). The elements required for a conviction of possession of a firearm during a crime of violence include: (1) knowing possession of a firearm, (2) without authorization, and (3) during a crime of violence. *United States v. Xavier*, 29 V.I. 279, 2 F.3d 1281, 1291 (3d Cir. 1953).

A firearm is defined as:

> any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition, including any air gas or spring gun or any "BB" pistols or "BB" guns that have been adapted or modified to discharge projectiles as a firearm.

23 V.I.C. § 451(d) (2001).

Crimes of violence include:

> the crime of, or the attempt to commit, murder in any degree, voluntary manslaughter, rape, arson, discharging or aiming firearms, mayhem, kidnapping, assault in the first degree, assault in the second degree, assault in the third degree, robbery, burglary, unlawful entry or larceny.

422

*Id.* at (e).

■ Here, it is undisputed that Smith knew he possessed a Glock nine millimeter semi-automatic handgun, which clearly falls under the definition of a firearm. At trial, Smith admitted that he was not licensed to carry a firearm. Robbery in the first degree, first degree assault, and third degree assault, are all crimes of violence. Accordingly, sufficient evidence existed for a reasonable jury to conclude that Smith was guilty of three counts of possession of a firearm during a crime of violence, in violation of Section 2253(a).

### 4. Possession of Ammunition

Smith was also convicted of possession of ammunition, in violation of title 14, section 2256 of the Virgin Islands Code ("Section 2256"). Possession of ammunition under Section 2256 occurs when "[a]ny person . . . unless authorized by law, possesses, sells, purchases, manufactures, advertises for sale, or uses any firearm ammunition. . . ." 14 V.I.C. § 2256(a) (2001). A firearm is defined as above, in title 23, section 451(d) of the Virgin Islands Code, and firearm ammunition means "any self-contained cartridge or shotgun shell, by whatever name known, which is designed to be used or adaptable for use in a firearm." 14 V.I.C. §§ 2256(c)(1)-(2). Thus, the elements for a violation of Section 2256 are (1) that the possession or use must be of firearm ammunition, and (2) it must be unauthorized. *See* 14 V.I.C. §§ 2256(a) & (c)(1)-(2).

■■ "The touchstone of criminal culpability under [S]ection 2256 is the absence of authorization to possess such ammunition." *Hunt v. Gov't of the Virgin Islands*, 46 V.I. 534, 538 (D.V.I. 2005). Like unauthorized possession of a firearm, affirmative defenses to unauthorized possession of ammunition exist for law enforcement officers, certain ammunition used by the United States Coast Guard, and ammunition used for certain industrial purposes. 14 V.I.C. § 2256(c)(3), (e); *Hunt*, 46 V.I. at 538. A defendant who is capable of asserting an affirmative defense to Section 2253 would presumably assert the same defense to a violation of Section 2256. Therefore, a defendant's conviction for possession of a firearm under Section 2253 may also imply that he was not authorized to carry ammunition or was exempt from Section 2256. *Id.* (reasoning that a defendant convicted under Section 2253 either did not assert that he was authorized or exempt at trial or made this assertion but it was rejected by the jury).

Smith argues that Section 2256 is ambiguous and should thus be read to require that the ammunition must be live. The Court disagrees.

 The definition of "firearm ammunition" is broad and unambiguous. Section 2256 clearly states that substance governs over form, ammunition must be self-contained and capable of being used in a device from which it could be discharged by gas generated from an explosive composition. *See* 14 V.I.C. § 2256(c)(1)-(2); 23 V.I.C. §451(d). Accordingly, to impose a "live" requirement on the definition of firearm ammunition would be to re-write the statute — a role properly left to the legislature, not the Court. *See E.I. DuPont De Nemours and Co. v. United States*, 460 F.3d 515, 526 n. 16 (3d Cir. 2006) (noting that when a statute's terms unambiguous, the inquiry should be restricted to the plain meaning of the text).

 Mason testified at trial that the magazine in question came with the Glock nine millimeter at the time of purchase and that he removed the magazine before leaving it with Smith. Smith even testified that he put the magazine back into the gun and left a bullet on the front seat of the car. Officer Boyce, who had nine year of police experience, inspected the bullets in the courtroom and stated that they did not look like they had been fired yet. Additionally, Smith testified at trial that he was not licensed to carry a firearm. Based on this evidence, a jury could find beyond a reasonable doubt that the magazine in question was designed for or capable of being used in the Glock nine millimeter firearm, and that Smith was not authorized to possess it.

## B. Post-Arrest Silence

Smith also argues that the prosecutor unconstitutionally commented upon his post-arrest silence. He contends that this comment constituted reversible error, and that defense counsel at trial was ineffective for failing to object.

 Generally, a prosecutor may not cross examine a criminal defendant about his post-arrest silence "because its prejudicial effect substantially outweighs its probative value." *United States v. Johnson*, 302 F.3d 139, 146 (3d Cir. 2002). Thus, the United States Supreme Court has held that a prosecutor's questions or remarks about a defendant's post-arrest silence may violate the defendant's due process protections. *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

■ However, "the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." *Id.* at 619 n.11 (1976). Additionally, a defendant's silence after his arrest but before he receives his *Miranda* warning may be used to impeach a testifying defendant. *Fletcher v. Wier*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand.").

■ It is appropriate to consider five factors when addressing alleged *Doyle* violations: (1) how the prosecution used the defendants silence; (2) who initiated the questioning on the silence; (3) the quantum of other evidence of guilt; (4) the intensity and frequency of the references; and (5) whether the trial court issued curative instructions. *See, e.g., Vick v. Lockhart*, 952 F.2d 999, 1002 (8th Cir. 1991); *see also Williams v. Zahradnick*, 632 F.2d 353, 361-62 (4th Cir. 1980).

During direct examination at trial, the prosecutor asked the Officer Boyce whether Smith had made any statements after being advised of his *Miranda* rights. Officer Boyce responded that Smith had not said anything. These two questions initiated by the prosecutor were the only references to Smith's post-arrest silence during the trial, after which the defense counsel made no objection. The jury received no curative instructions regarding this questioning.

It is difficult to discern from this brief and isolated inquiry how the prosecutor intended to use Smith's silence. The defense counsel did not make his opening statement until after the prosecution had rested its case in chief, so it is not clear that the prosecutor would have intended to impeach an unknown future defense. As discussed above, the other evidence was sufficient to convict Smith on all counts for which he was charged. Accordingly, despite the lack of curative instructions, the Court finds that the government did not attempt to capitalize on Officer Boyce's testimony in order to "attack the heart of the case." *See United States v. Cummiskey*, 728 F.2d 200, 204 (3d Cir. 1984) (quoting *United States v. Massey*, 687 F.2d 1348, 1353-54 (10th Cir. 1982)).

■ Although the Court is troubled by the prosecutor's questions about Smith's post-arrest silence, the questions do not pose a risk of prejudice

sufficient to violate Smith's due process protections. *See, e.g., Greer v. Miller*, 483 U.S. 756, 764-765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (finding no *Doyle* violation where only question addressed the defendant's post-arrest silence, there was no further questioning or argument on this issue, significant other evidence supported a conviction, and the jury received only general curative instructions about objections — though the court sustained an objection to the question); *United States v. Ylda*, 643 F.2d 348, 351 (5th Cir. 1981) (doubting that "the mere asking of the question caused any prejudice to appellant in the minds of the jury" where there was no answer by the defendant or impeaching testimony concerning his post-arrest silence, the inquiry was a brief isolated incident that was never mentioned again at trial, and there was substantial other testimony supporting the conviction); *Cf. Hassine v. Zimmerman*, 160 F.3d 941, 947-48 (3d Cir. 1998) (finding a *Doyle* violation where the prosecutor questioned the defendant three times about any post-arrest statements he made about his alibi, made two references to his silence during closing argument, and there were no curative instructions).

▮ Because there is no *Doyle* violation here, the trial court did not err in permitting these two questions. Similarly, the Court is without occasion to address Smith's claim for ineffective assistance of counsel, as it is based entirely on his unfounded allegations that a *Doyle* error occurred at trial.[5]

## C. Hearsay Allegation

Smith next argues that the Superior Court erroneously permitted the prosecutor to bolster the veracity of Hyppolite by having him testify regarding his prior interview an investigator. Smith objected on the ground that the prosecutor asked a leading question.

▮ Whether testimony is hearsay is subject to plenary review. *United States v. McGlory*, 968 F.2d 309, 332 (3d Cir. 1992). Furthermore, a verdict or judgment shall not be set aside or reversed "by reason of the

---

[5] Specifically, Smith claims that his trial counsel was ineffective because (1) had counsel objected to the prosecutor's inquiry into his post-arrest silence, the Superior Court would have been duty bound to sustain the objection; and (2) if the Superior Court would have overruled such objections, the standard of review of the purported *Doyle* error would have been *de novo*.

erroneous admission of evidence unless [] there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." 5 V.I.C. § 774. Because Smith did not object to the admission of Hyppolite's statement on the specific ground of hearsay, this matter is reviewed for plain error. *Nibbs v. Roberts*, 31 V.I. 196, 222 (D.V.I. App. Div. 1995) (finding that an issue was not preserved for review on appeal except for plain error because appellant made a general objection when he could have made a specific objection). Under this standard, we will reverse the Superior Court only where a plain error was "fundamental and highly prejudicial" such that the admission of the testimony "failed to provide the jury with adequate guidance and our refusal to consider the issue would result in a miscarriage of justice." *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 339 (3d Cir. 2005).

Hearsay is defined as "a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated . . . ." 5 V.I.C. § 932 ("Section 932"). Hearsay is not admissible unless an exception applies. *Id.* Thus, generally a witness cannot testify as to what she told someone outside of court, unless a hearsay exception applies. However, Section 932(1) provides an exception to the hearsay exclusion rule:

> A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness . . . .

5 V.I.C. § 932(1).

As discussed above, the prosecutor asked Hyppolite whether he made any statements to an investigator after July 23, 2003, and whether such statement was the same as the statements he made in court. Hyppolite simply responded "yes" to both questions. (Trial Tr. 169, January 12, 2004.)

Smith contends that the two questions elicited hearsay responses from Hyppolite. The government argues that Hyppolite's responses were not hearsay, were subject to a hearsay exception, or were simply cumulative and not harmful. The government asserts that because Hyppolite's testimony included no details regarding the content of his statement to the

investigator, it could not be considered to be a statement used to prove the truth of the matter stated. However, even if this testimony was used to prove the truth of the matter asserted, a hearsay exception applied.

 Hyppolite was present at the trial and available for cross-examination with respect to the statement he made to the investigator as well as its subject matter. Hyppolite did in fact testify regarding the statement he made to the investigator as well as to the substance of the events that occurred on July 23, 2003. His testimony as to his prior statement was admissible because he adopted it on the stand, where he was subject to cross-examination. Accordingly, the trial court did not err in admitting the above testimony.

 Finally, even if the testimony was improperly permitted, it was not prejudicial because it was cumulative. *See Joseph v. Gov't of the V.I.*, 46 V.I. 612 (D.V.I. App. Div. 2005) (holding improper admission of hearsay evidence harmless: when cumulative) *rev'd on other grounds*, 46 V.I. 612 (3d Cir. 2006). Indeed, the investigator also testified that he had interviewed Hyppolite after July 23, 2003. Moreover, cross-examination of Hyppolite by defense counsel confirmed that the statements Hyppolite made to the investigator were consistent with the testimony he gave in court. Therefore, even if Hyppolite's testimony were inadmissible hearsay, it would have been cumulative and thus harmless.

## D. Title 23, Section 470 of the Virgin Islands Code

Finally, Smith claims that the Superior Court committed plain error in failing- to instruct the jury that he had an affirmative defense against the charges of unauthorized possession of a firearm and unauthorized possession of ammunition. Smith asserts that he had been given both the gun and the ammunition on July 22, 2003, and was in possession of both items for under 24 hours.

 Smith cites title 23, section 470 of the Virgin Islands Code ("Section 470"), as well as *Toussaint v. Virgin Islands*, 45 V.I. 455, 301 F. Supp. 2d 420 (D.V.I. App. Div. 2004), for authority that Virgin Islands law allowed a person twenty-four hours to register a firearm in his possession. *See* 23 V.I.C. § 470(a) (1996); *Toussaint v. Gov't of the V.I.*, 45 V.I. 455, 301 F. Supp. 2d 420 (D.V.I. App. Div. 2004). While this twenty-four hour grace period was an affirmative defense to charges under Sections 2253 and 2256 in the past, Section 470 was amended in 1996 to eliminate this

affirmative defense. *See* 23 V.I.C. § 470 (1996). For the past ten years the text of Section 470(a) has provided as follows:

> Any person other than a licensed dealer, who purchases or otherwise obtains any firearms or ammunition from any source within or outside of the Virgin Islands shall report such fact in writing or in person to the Commissioner *immediately* after receipt of the firearm or ammunition, furnishing a complete description of the firearm or ammunition purchased or otherwise obtained. He shall also furnish his own name, address, date of birth and occupation.

*Id.* (emphasis added). Indeed, the "Notes, References and Annotations" section notes: "— 1996. Subsections (a) and (b): Substituted 'immediately' for 'within 24 hours'." *Id.*

Moreover, the very case upon which relies directly contradicts his argument:

> Consistently with the Court of Appeals, we also held that § 470, which at the time allowed a person 24-hours to register a firearm in their possession, was an affirmative defense and not an element of the offense because it did not authorize possession. It merely gives a person a grace period in which to register the firearm. The law, however, was amended in 1996 to eliminate the 24-hour grace period and require that all firearms entering the Territory immediately must be registered with the Virgin Islands Police Department.

*Toussaint*, 301 F. Supp. 2d at 423 n. 4; *see also United States v. McKie*, 36 V.I. 367, 112 F.3d 626, 631 (3d Cir. 1997) (acknowledging that "[i]n September 1996, the statute was amended again, requiring 'immediate' registration.") Accordingly, Smith's final argument has no merit.

### IV. CONCLUSION

Smith's appeal will be denied. Sufficient evidence exists for a reasonable jury to convict him of all seven counts for which he was convicted. While the Court is troubled by the prosecutor's questions relating to Smith's post-arrest silence, admission of this brief, isolated inquiry did not constitute a trial error under *Doyle*. Additionally, the evidence included at his trial clearly falls within the Virgin Islands hearsay exception. Finally, the Superior Court Committed no error by

failing to instruct the jury about the twenty-four hour grace period for unauthorized possession of firearms and ammunition, as that affirmative defense was abolished in 1996. An appropriate judgment follows.