COURT OF APPEALS OF VIRGINIA

Present:   Judges Callins, White and Bernhard
Argued at Williamsburg, Virginia

MICHAEL ELIGISAH WATKINS

MEMORANDUM OPINION[*] BY
v.        Record No. 0731-24-1        JUDGE DOMINIQUE A. CALLINS
SEPTEMBER 30, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Matthew W. Hoffman, Judge

Charles E. Haden for appellant.

Austin E. Deramo, Assistant Attorney General (Jason S. Miyares,
Attorney General; Anderson W. Peake, Assistant Attorney General,
on brief), for appellee.


Following a jury trial, the trial court convicted Michael Eligisah Watkins of two counts

each of strangulation and aggravated sexual battery, and one count each of forcible sodomy,

rape, abduction, and brandishing a firearm.  On appeal, Watkins challenges the sufficiency of the

evidence to sustain his convictions.  Finding no error, we affirm.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

From July to September 2019, M.W.[2] and Watkins had an intimate romantic relationship. On the night of September 11, 2019, Watkins picked up M.W. from her work at around 10:00 p.m. and drove to his apartment. Once there, M.W. invited her friend, Venita Burke, over for dinner. After Burke arrived, the three sat down for conversation and drinks. During that conversation, Watkins removed a gun from his hip and placed it on the table around which Watkins, Burke and M.W. were sitting. Watkins told Burke that he had "eyes everywhere" and that he "own[ed] [M.W.]." Watkins also said that he wanted a threesome with M.W. and Burke. M.W. became uncomfortable, went into the bathroom, and then started cooking dinner. Before M.W. finished cooking, however, Watkins asked Burke to leave the apartment.

After Burke left the apartment, Watkins began yelling at M.W. and accused her of having a sexual relationship with Burke. Although M.W. denied his accusations, Watkins choked M.W. for "a good while" and hit M.W. multiple times. Watkins then grabbed the gun and held it to M.W.'s head. As he held the gun to her head, Watkins told M.W. that there were "people outside watching" who would shoot her if she tried to leave.

Watkins eventually released M.W. and stepped outside briefly. She quickly sent a message from her phone to Burke while Watkins was outside, asking her to call the police and

---

[1] "[W]e review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "Viewing the evidence through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* at 97 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018) (per curiam)). "'This deferential principle' applies to issues of witness credibility and the factfinder's interpretation of all the evidence." *Reed v. Commonwealth*, 85 Va. App. 196, 201 n.1 (2025) (quoting *Barney*, 302 Va. at 97).

[2] "We use initials, instead of the victim's name, to protect her privacy." *Poole v. Commonwealth*, 73 Va. App. 357, 360 n.1 (2021).

not text back.  M.W. then deleted the message from her phone, fearing that Watkins would kill her if "he read or saw that [M.W.] reached out for help."  When Watkins returned, he grabbed M.W. by the throat again and pushed her against the wall.  He eventually let go of her throat, and the two sat down to eat dinner.  When he finished, Watkins took M.W.'s keys and phone from her and went to sleep on the living room couch.  He told M.W. to wake him up once she finished eating.  Watkins previously hit M.W. if she refused to do anything he said, so she feared not following his directions.

M.W. took her time eating and cleaning up dishes, hoping the police would arrive, but they never came.[3]  Eventually, as Watkins had instructed her, M.W. woke Watkins, and then went with him to the bedroom.  Before lying down in bed, Watkins placed M.W.'s phone and keys, and his handgun under the mattress within his reach.  He then laid down on top of them.  As Watkins slept, M.W. sat on the bed, trying to think of a plan to escape, but she eventually fell asleep.

Before sunrise the following morning, Watkins woke M.W. and told her to lay on her stomach.  M.W. understood that this request meant he wanted to have sex with her and that he would hit her if she refused.  M.W. had removed her clothing the night before because Watkins would hit her if she slept in clothing.  M.W. did not want to have sex with Watkins because, "who would want to after everything [Watkins] did to [M.W.] the night before"?  But, fearing Watkins's ire, M.W. laid on her stomach, and Watkins inserted his penis into M.W.'s vagina as he spat on her, called her a "b****," and eventually ejaculated inside of her.  Watkins then told M.W. to "clean him up" by performing fellatio and anilingus as "punishment."  He also hit M.W. in the face when she was "doing it wrong."  After M.W. finished, Watkins vaginally penetrated

---

[3] Burke called the police twice, but she did not know the apartment number, so the police were unable to locate it or make contact with M.W.

her a second time. M.W. did not want to have sex with Watkins at this point either, but she "wanted to get it done and over with."

Later, M.W. reminded Watkins that she was due in traffic court. After he ejaculated again, Watkins "allow[ed]" M.W. to take a shower. While M.W. was in the shower, Watkins read through messages on her phone. When M.W. got out of the shower, Watkins asked her about an old message and then started "punching the life out of [her]" on the bed. Watkins hit M.W. so hard that her ear popped and started ringing. Eventually, Watkins stopped beating M.W., she got dressed, and he dropped her off at traffic court in her car.

After M.W. resolved her traffic ticket, Watkins picked her up and drove to his mother's house. Along the way, Watkins noticed the injury to M.W.'s ear. He tried to cover her ear with her hair and told her, "I didn't hurt you, I just hurt your feelings." At Watkins's mother's house, Watkins and his mother were inside the house as M.W. sat in the car. As soon as Watkins was inside the house, M.W. jumped into the driver's seat, started the car, and "jetted" off toward her own mother's house. Nearing the house, M.W. pulled over to call Burke through Facebook before seeing Watkins and his mother approaching. M.W. attempted to drive away from them, but Watkins's mother cut her off. M.W. made a quick U-turn, pulled into her mother's driveway, and ran into the house. M.W.'s sisters were home and called the police.

Newport News Police Officer James Odom arrived and took pictures of M.W.'s injuries, including a swollen ear, scratches on her neck, and bruises on her body. M.W. "just wanted this big nightmare" to end, so she did not disclose that Watkins sexually assaulted her. Indeed, she did not immediately disclose the sexual assault to anyone because she was "scared," "ashamed," and "embarrass[ed]" and wanted the "whole ordeal . . . to disappear." Initially, M.W. was "very hesitant" to speak with Officer Odom and was "reluctant" to give him Watkins's name, though she did eventually tell Officer Odom that Watkins choked and hit her.

Watkins began sending text messages to M.W.'s phone that night and later came to her house and started banging on the back door. The following morning, Watkins's mother started calling M.W. and threatening her. To protect herself and because she was "terrified of [Watkins] harassing [her]," M.W. obtained a protective order. Then, two days after the assault, Burke "talked [M.W.] into pressing charges." The Newport News Police Department referred M.W. to Detective Eric Meisel of the Special Victims unit; Detective Meisel interviewed M.W. at the hospital. M.W. told Detective Meisel that Watkins choked her, threatened her with a gun, and sexually assaulted her.

Later that same day, forensic Sexual Assault Nurse Examiner ("SANE") Brittany Payne performed a physical exam on M.W. and collected evidence for a Physical Evidence Recovery Kit ("PERK"). The exam did not show any injury to M.W.'s vaginal tissue, and DNA analysis of samples from the PERK did not return any matches. During the exam, however, Payne observed that M.W.'s ear was ruptured from "blunt trauma" and identified evidence of strangulation. Police arrested Watkins two days later, charging him with two counts each of aggravated battery and strangulation and one count each of sodomy, rape, abduction, and brandishing a firearm.

At trial, Burke's testimony corroborated M.W.'s statements about the evening of September 11 and the events leading up to Watkins ordering Burke to leave. Detective Meisel also testified that sexual assault victims often delay reporting and that reports of sexual assault are often made at the hospital first rather than at the police station. He testified that it is "not uncommon for there not to be vaginal injuries" in sexual assault cases. Payne went further, testifying that "it's not been common for [her] to find [vaginal] injuries" during her examinations. She testified that, of the 15 sexual assault victims she had examined in her career,

she had only seen 2 with vaginal injuries. She also noted that, on average, victims of sexual assault committed by a romantic partner delayed reporting for over a month.

At the close of the Commonwealth's case-in-chief, Watkins moved to strike her evidence four separate times. He first moved to strike the sexual offenses since, he argued, (1) the aggravated sexual battery charges were duplicative of the rape and sodomy charges, and (2) the Commonwealth failed to prove four distinct sexual acts between the rape, sodomy, and aggravated sexual battery charges. Watkins then moved to strike the Commonwealth's evidence as to abduction, arguing that M.W. was not held against her will. Next, he moved to strike the sexual offenses on the basis that M.W. was not forced. Last, Watkins moved to strike the Commonwealth's evidence as to all charges, arguing that M.W.'s testimony was inherently incredible. The trial court denied each of Watkins's motions.

Watkins testified on his own behalf. Watkins asserted that Burke never came over to his apartment and that he had never seen her outside of the courtroom. Watkins denied "drinking with either one of them." According to Watkins, he and M.W. had sex every day during their relationship but claimed they had not on the night in question or the following morning. On September 12, 2019, when he and M.W. went to his mother's house, Watkins said he went inside and when he came out, M.W. was gone, and he never saw her again. Watkins claimed that when he saw M.W. last, she did not have any scratches, bruises, or injuries. Don Michael Cunnius, a forensic DNA expert, testified to a DNA analysis he performed on M.W.'s PERK. Cunnius stated that, generally, he could recover DNA evidence from a sample collected within two days of an assault. But he confirmed that "moving around, showering, [and] changing [clothes]" can lead to a loss of DNA over two days.

Watkins renewed his motions to strike, which the trial court denied. The jury convicted Watkins of both counts each of aggravated sexual battery and strangulation, and each count of

sodomy, rape, abduction, and brandishing a firearm.  The trial court sentenced Watkins to 100

years and 12 months of incarceration with 80 years suspended.  Watkins appeals.

ANALYSIS

We review Watkins's challenge to the sufficiency of the evidence for plain error.[4]  On

plain error review, "[t]he judgment of the trial court is presumed correct and will not be

disturbed unless it is plainly wrong or without evidence to support it."  *McGowan v.*

*Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v.*

*Commonwealth*, 296 Va. 450, 460 (2018)).  We do not ask ourselves "whether [*we*] believe[] that

the evidence at the trial established guilt beyond a reasonable doubt."  *Id.* (quoting *Secret v.*

*Commonwealth*, 296 Va. 204, 228 (2018)).  Instead, "the relevant question is whether '*any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'"  *Caldwell v. Commonwealth*, 298 Va. 517, 526 (2020) (emphasis added) (quoting

*Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)).

"This familiar standard gives full play to the responsibility of the trier of fact fairly to

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from

basic facts to ultimate facts."  *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting

*Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)).  And where, as here, the jury renders

a general verdict, it is "presumed to be responsive to all the issues in the case affecting the

---

[4] Watkins's broad assignment of error barely complies with Rule 5A:20(c)(2).  Watkins asserted that the trial court erred by "denying [his] motion to strike."  At trial, the court denied four individual motions to strike, each advanced separately by Watkins.  Rule 5A:20(c)(2) requires assignments of error to address the rulings in the trial court from which an appeal is taken, and if the assignments are insufficient, "the appeal will be dismissed."  Here, we find Watkins's assignment of error minimally compliant because (1) before Watkins made his initial set of motions, he stated "we have a Motion to Strike"; and (2) the trial court's conviction order reflects that Watkins "moved the [c]ourt to strike the evidence."  Although his assignment does little to aid the Commonwealth or the Court in identifying the ruling he specifically contests, we find sufficient corroboration in the record to characterize his multiple motions to strike as a single, omnibus one.

correctness of the verdict, and it is only where it affirmatively appears from the record that it is uncertain whether the verdict responds to all such issues that it will be held to be invalid." *Fields v. Commonwealth*, 129 Va. 774, 780 (1921) (citation omitted).

Each of Watkins's arguments is considered in turn.

I. Four Distinct Acts

Watkins first argues that the Commonwealth failed to prove four distinct acts to support both counts of aggravated sexual battery as distinct from the rape and sodomy. He asserts that M.W. testified only to two incidents and that the aggravated sexual battery counts are necessarily duplicative of the rape and sodomy charges. We disagree.

"The elements of rape . . . consist of engaging in sexual intercourse with the victim, against her will, by force, threat, or intimidation." *Sheets v. Commonwealth*, 80 Va. App. 706, 714-15 (2024) (alteration in original) (quoting *Commonwealth v. Minor*, 267 Va. 166, 173 (2004)). Similarly, the elements of forcible sodomy may consist of "engag[ing] in . . . fellatio [or] anilingus . . . with a complaining witness . . . against the will of the complaining witness, [or] by force, threat or intimidation of or against the complaining witness." Code § 18.2-67.1(A)(2). The accused may also be "guilty of aggravated sexual battery if he . . . sexually abuses the complaining witness . . . against the will of the complaining witness by force, threat or intimidation . . . [while] us[ing] or threaten[ing] to use a dangerous weapon."[5] Code § 18.2-67.3(A)(4)(c). Neither rape, sodomy nor aggravated sexual battery is a lesser-included offense of the other because each "contains an element that the [other] offense does not contain." *Bowden v. Commonwealth*, 52 Va. App. 673, 676 (2008) (quoting *Dalton v. Commonwealth*, 259

---

[5] As used in Code § 18.2-67.3, "sexual abuse" may mean "an act committed with the intent to sexually molest, arouse, or gratify any person, where: . . . [t]he accused intentionally touches the complaining witness's intimate parts or . . . forces the complaining witness to touch the accused's . . . intimate parts." Code § 18.2-67.10(6). The term "intimate parts" refers to the "genitalia, anus, groin, breast, or buttocks of any person." Code § 18.2-67.10(2).

Va. 249, 253 (2000)) (holding that forcible sodomy and aggravated sexual battery are not lesser-included offenses of one another).

Here, the jury's finding that Watkins engaged in four distinct sexual crimes which support his rape, forcible sodomy, and two aggravated sexual battery convictions is not plainly wrong or without evidentiary support. The evidence was sufficient to prove four distinct sexual acts corresponding to each conviction. The jury heard evidence that Watkins penetrated M.W.'s vagina with his penis against her will—i.e., a rape. He then ordered M.W. to "clean" his penis by performing fellatio on him against her will, establishing an act of forcible sodomy. Soon thereafter, Watkins punished M.W. for her earlier interactions with Burke by directing her to perform anilingus on him. And, afterward, Watkins vaginally penetrated M.W. with his penis a second time. Together with Watkins's ongoing threats of violence against M.W. and his maintenance of the handgun under his side of the mattress, these latter two events constitute distinct factual predicates which support each charge of aggravated sexual battery. Hence, Watkins's argument that the Commonwealth failed to prove four distinct assaults fails.

II. Force, Threat, or Intimidation

Watkins next contends that the Commonwealth's evidence for the sexual assault charges was insufficient since M.W. did not testify that Watkins used violence to force her to perform sexual acts. He argues that he could not have sexually assaulted M.W. because M.W. previously engaged in consensual intercourse with Watkins. He claims that M.W.'s willingness to engage in intercourse with Watkins was evidenced by her "disrob[ing]" so Watkins could have "better access to her body." Again, we disagree.

Rape, forcible sodomy, and aggravated sexual battery each require proof that the accused used force, threat or intimidation in perpetration of the offense. Code §§ 18.2-67.1(A)(2), -67.3(A)(4)(c); *Sheets*, 80 Va. App. at 714-15. Force requires "evidence of

'some array or show of force in form sufficient to overcome resistance'" and "must be used to overcome the victim's will." *Sabol v. Commonwealth*, 37 Va. App. 9, 16 (2001) (quoting *Jones v. Commonwealth*, 219 Va. 983, 986 (1979)). Meanwhile, threat requires "expression of an intention to do bodily harm." *Id.* at 17 (quoting *Morse v. Commonwealth*, 17 Va. App. 627, 634 (1994)). Intimidation differs from threat as intimidation "may occur without threats" and refers to "putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will." *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985).

Here, the jury's finding that Watkins used force, threat, or intimidation while committing rape, forcible sodomy, and aggravated sexual battery is not plainly wrong or without evidentiary support. Watkins used actual and threatened violence as a tool to condition M.W. into complying with his sexual demands. For example, M.W. removed her clothing before getting into bed with Watkins because he would hit her if she slept in clothing. Similarly, when Watkins told her to lay on her stomach, M.W. knew that he wanted to have sex with her and that he would hit her if she refused. Aside from her fears of his violence if she did not comply, M.W. did not want to have sex with Watkins after he choked her multiple times and held a gun to her head the night before. During his assault of M.W., she was aware that Watkins kept his handgun under the mattress within his reach, and he hit M.W. in the face when she was "doing it wrong."

Based on these facts, a reasonable juror could have found that Watkins hitting M.W. when she was "doing it wrong" constituted a "show of force" to "overcome [M.W.'s] will." *Sabol*, 37 Va. App. at 16. A reasonable juror likewise could have found that Watkins intimidated M.W. by creating an environment where M.W. felt her compliance with Watkins's sexual demands was mandatory and her noncompliance would be met with violence—i.e., by "putting [M.W.] in fear of bodily harm . . . to overcome her mind and overbear her will." *Sutton*, 228 Va. at 663. M.W. was choked and threatened at gunpoint less than 12 hours prior to being sexually

assaulted for walking out of the room when Watkins expressed a desire for a threesome with M.W. and Burke. From this fact, a reasonable juror could have found that M.W. submitted to Watkins's sexual advances that morning out of fear, and "[s]ubmission through fear to sexual intercourse is not consent." *Id.*

III. Abduction

Next, Watkins contends that the evidence was insufficient to sustain his abduction conviction since M.W. "elected to remain with [Watkins] . . . and voluntarily chose to climb into bed and sleep naked with him in the same bed overnight." He also argues that even if M.W. was detained by Watkins, her detention was ancillary and incidental to the sexual assault. We disagree with both of Watkins's arguments.

"Any person who, by force, intimidation or deception, and without legal justification or excuse . . . detains . . . another person with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction.'" Code § 18.2-47(A). "Put simply, the *actus reus* of the crime is a taking, transporting, or detention of another, while the *mens rea* of the crime is a specific intent to deprive another of her liberty." *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022). Detaining a victim entails "having that victim 'remain in a certain location, or even in a certain position' through the use of force, intimidation, or deception." *Commonwealth v. Herring*, 288 Va. 59, 74 (2014) (quoting *Burton v. Commonwealth*, 281 Va. 622, 628 (2011)). In this context, detention may be achieved by "having that victim remain within a house." *Id.* at 75. For purposes of abduction, "[i]ntimidation is defined as '[u]nlawful coercion; extortion; duress; putting in fear.'" *Brown*, 74 Va. App. at 731 (second alteration in original) (quoting *Bivins v. Commonwealth*, 19 Va. App. 750, 752 (1995)). "[A] victim suffers fear of bodily harm in the abduction context if the defendant imposes 'psychological pressure on

[the victim] who, under the circumstances, is vulnerable and susceptible to such pressure.'" *Id.* at 732 (second alteration in original) (quoting *Sutton*, 228 Va. at 663).

Although this Court reviews de novo the question of whether an abduction is "merely incidental to another crime," we "defer to the trial court's findings of historical fact." *Hoyt v. Commonwealth*, 44 Va. App. 489, 496 n.4 (2004). "[T]he General Assembly did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape . . . a criminal act, punishable as a separate offense." *Lawlor v. Commonwealth*, 285 Va. 187, 224 (2013) (quoting *Brown v. Commonwealth*, 230 Va. 310, 314 (1985)). "The only issue when abduction is charged alongside an offense for which detention is an intrinsic element is whether any detention exceeded the minimum necessary to complete the required elements of the other offense." *Id.* at 225. Relevant to the issue, we consider "the duration of the detention" and whether the detention (1) "occurred during the commission of a separate offense;" (2) "is inherent in the separate offense;" or (3) "created a significant danger to the victim independent of that posed by the separate offense." *Hoyt*, 44 Va. App. at 494 (quoting *Gov't of V.I. v. Berry*, 604 F.2d 221, 227 (3d Cir. 1979)).

Here, the jury's finding that M.W.'s detention by Watkins was not voluntary is not plainly wrong or without evidentiary support. Contrary to Watkins's contentions, M.W. did not elect to remain with Watkins and did not voluntarily choose to sleep naked in bed with him. The jury heard testimony that while drinking with M.W. and Burke, Watkins placed a gun on the table and told Burke that he "own[ed] [M.W.]" and that he had "eyes everywhere." When M.W. left the room in response to Watkins's suggestion of a threesome with Burke, Watkins told Burke to leave and proceeded to choke and hit M.W. He held a gun to M.W.'s head as he told her that he had "people outside watching" who would shoot her if she tried to leave. Watkins later took

M.W.'s keys and phone from her, placing them under his side of the mattress along with his handgun.

M.W. did not attempt to escape, even when Watkins was sleeping, having previously endured Watkins's violence for disobeying his orders. During her brief reprieve when Watkins was outside and she had access to her phone, M.W. texted Burke asking her to call the police, reflecting the involuntary nature of M.W.'s detention with Watkins. When the police did not arrive, M.W. testified that she laid awake on the bed, trying to conjure up an escape plan. The next day, Watkins would not allow M.W. to drive her own car to traffic court, instead dropping her off. Ultimately, M.W. only escaped Watkins's detention by driving away from Watkins as he went inside his mother's house; even then, Watkins and his mother chased after M.W., stopping only when M.W. took refuge in her family's home.

Based on the foregoing, the jury had evidence before it that Watkins required M.W. to remain in his home and in his presence by intimidation. *Herring*, 288 Va. at 74-75. M.W. was "put[] in fear" by Watkins's displays and threats of violence, wielding of a gun, and control of M.W.'s movements and property. *Brown*, 74 Va. App. at 731 (quoting *Bivins*, 19 Va. App. at 752). She suffered bodily harm because of Watkins's actions, succumbing to what a reasonable juror could conclude was psychological pressure he imposed, and enduring his sexual and physical violence. *Id.* at 732. Simply put, M.W. did not remain with Watkins voluntarily.

Further, her detention was not merely incidental to Watkins raping, forcibly sodomizing, and sexually battering M.W. Although M.W.'s detention overlapped with the detention inherent in the sexual assault, M.W.'s detention started well before the sexual assault and ended well after. Watkins took steps to deprive M.W. of the ability to communicate with others, used violence to exert his dominance over M.W. in front of others, and prevented her from using her own car to undermine her chances for physical escape. This ongoing detention, which lasted

- 13 -

overnight and through the following day, created a significant danger to M.W. as she was denied the opportunity to seek care for her compounding injuries. And this detention was not necessary for Watkins to carry out his sexual assault of M.W. in the middle of the night; those events made up only a fraction of the time M.W. was detained by Watkins. Watkins's detention of M.W., therefore, "exceeded the minimum necessary to complete the required elements of" rape, forcible sodomy, and aggravated sexual assault. *Lawlor*, 285 Va. at 225.

IV. Inherent Incredibility

Watkins punctuates his challenge by arguing that the evidence was insufficient to sustain any of his convictions since M.W.'s testimony was inherently incredible. He asserts that M.W.'s testimony was rife with inconsistencies and that M.W. was unable to recall key facts in the case. He argues that M.W.'s allegations were uncorroborated by other evidence. Watkins further argues that M.W.'s testimony was inherently incredible because (1) he denied sexually assaulting or harming M.W.; (2) DNA evidence was not discovered; (3) no injuries to M.W.'s vagina or anus were discovered; and (4) M.W. delayed reporting the sexual assaults. We disagree.

"As to the matter of witness credibility . . . the scope of our review is . . . narrow[]." *Grimaldo v. Commonwealth*, 82 Va. App. 304, 320 (2024). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "Moreover, we cannot say that a witness's testimony is '*inherently* incredible [unless it is] *so* contrary to the human experience as to render it unworthy of belief.'" *Grimaldo*, 82 Va. App. at 321 (alteration in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)). "In the absence of such extraordinary contradiction, we defer to the factfinder's conclusions on issues of witness credibility." *Id.*

- 14 -

"These same principles apply in cases involving rape, sodomy, and other sexual offenses, which may be sustained solely upon the testimony of the victim, even in the absence of corroborating evidence." *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548-49 (2000)). Indeed, "the testimony of a single witness, if found credible by the trial court and not found inherently incredible by this Court, is sufficient to support a conviction." *McCary v. Commonwealth*, 36 Va. App. 27, 41 (2001). The fact that a "witness may have delayed in reporting knowledge of a case or given inconsistent statements . . . does not necessarily render the testimony unworthy of belief." *Juniper*, 271 Va. at 415. These circumstances are "appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine." *Id.* And, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (alteration in original) (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011)).

Here, M.W.'s testimony is not inherently incredible. First, the fact that Watkins's own testimony contradicted M.W.'s does not make her testimony inherently incredible. The jury was entitled to disbelieve his self-serving testimony. *Id.* Second, experts testified that the lack of DNA evidence or physical injuries is consistent with human experience. *Grimaldo*, 82 Va. App. at 321. Detective Meisel testified that it is "not uncommon for there not to be vaginal injuries" in sexual assault cases, and Payne testified that "it's not been common for [her] to find [vaginal] injuries" during her examinations. Watkins's own expert testified that normal activities such as "moving around, showering, [and] changing [clothes]" can lead to a loss of DNA over the course of two days. Third, M.W.'s negligible two-day delay in reporting is consistent with the common behavior of sexual assault victims, especially those assaulted by romantic partners. We have

previously held that a seven-year delay in reporting may not render a victim's testimony inherently incredible. *See Love v. Commonwealth*, 18 Va. App. 84, 90 (1994). Any concerns caused by a delay in reporting are properly left to the jury. *Id.*

Moreover, and contrary to Watkins's assertions, M.W.'s testimony was well corroborated by the evidence and testimony presented at trial. Burke's testimony corroborated all of M.W.'s statements about the events in the apartment leading up to the incident, such as Watkins's possessive rant and placing a gun on the table. Burke also confirmed that M.W. messaged her asking that she "call the police" and "don't text back." A jury would consequently have a sufficient basis for believing the credibility of M.W.'s testimony as to the precipitating events. As for the actual assaults, Burke and Detective Meisel both observed injuries on M.W. consistent with the assaults as she described them. The jury also considered photographic evidence of these same injuries.

In sum, M.W.'s testimony was not inherently incredible since her testimony was not "*so contrary to the human experience as to render it unworthy of belief.*" *Grimaldo*, 82 Va. App. at 321 (quoting *Johnson*, 58 Va. App. at 315).

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*